**UNIFORM OIL COMPANY, Appellant,**

v.

**PHILLIPS PETROLEUM COMPANY,**
**a Delaware Corp., et al., Appellees.**

**No. 21803.**

United States Court of Appeals
Ninth Circuit.

Sept. 4, 1968.

As Amended Oct. 18, 1968.

---

Lloyd J. Skedd (argued), Helena, Mont., for appellant.

Loble, Picotte & Fredricks, Helena, Mont., Corette Smith & Dean, Butte, Mont., for appellees.

Before ELY and CARTER, Circuit Judges, and REAL, District Judge.

ELY, Circuit Judge:

Appellant Uniform Oil Company, plaintiff below, brought suit in the District Court against the appellees, alleging violations of sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, and seeking injunctive relief, 15 U.S.C. § 26, and treble damages, 15 U.S.C. § 15. The District Court granted the defendants' motion for a directed verdict, and Uniform Oil appeals. We affirm.

Uniform Oil is a Montana corporation which operated a single retail gasoline and service station in Helena, Montana. Appellee Phillips Petroleum Company is a major oil producer and petroleum products retailer. Appellee Bridges is Phillips' jobber in Helena. He performs the function of Phillips' agent. He leases four service stations from Phillips in Helena, operating one himself and subleasing the others to appellees Cullen, Gardner, and Norwood, who each operates the station leased by him. Bridges purchases Phillips' products from Phillips and in turn sells them to his lessees. He receives no commissions from Phillips for performing the function of jobber. Phillips owns all the permanent fixtures which comprise the four stations in Helena, but the individual lessees own their respective inventories.

 In its complaint Uniform Oil alleged that the appellees had conspired to restrain trade and eliminate competition, in violation of the Sherman Act, by engaging in price fixing in the retail gasoline market in Helena, Montana. In reviewing the District Court's directed verdict, we are required to decide "whether the evidence in its entirety would rationally support a verdict for the plaintiff, assuming that the jury took, as it would be entitled to take, a view of the evidence most favorable to the plaintiff." Wilkerson v. McCarthy, 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring). Viewed in this light, the evidence would support the determination, had it been made, not only that the individual appellees entered into a price-fixing agreement among themselves, but also that Phillips was involved in the conspiracy. It is, of course, well settled that, within the scope of the Sherman Act, price fixing is illegal per se. Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed. 2d 545 (1958).

The district judge believed that although there may have been an agree-

ment among the individual appellees to fix prices, the fact that they agreed to *lower*, rather than raise, the prices negated any unlawful intent. He also concluded that there was absence of proof that Phillips was a party to whatever agreement or conspiracy the individual appellees may have undertaken. Uniform Oil's contentions on appeal with regard to these points appear to have merit, but we do not reach them. Nor do we need consider the appellees' contention that Uniform Oil failed to prove the amount of damages, if any, sustained by it.

■ The directed verdict was proper because Uniform Oil failed to offer adequate proof that the activity in question was in interstate commerce or had a substantial effect upon interstate commerce.[1] As the Supreme Court has recently stated, "it is well established that an activity which does not itself occur *in* interstate commerce comes within the scope of the Sherman Act if it substantially *affects* interstate commerce." Burke v. Ford, 389 U.S. 320, 321, 88 S.Ct. 443, 444, 19 L.Ed.2d 554 (1967) (emphasis in original). The alleged illegal activities of which Uniform Oil complained occurred only in the city of Helena and were, therefore, intrastate in nature. This being so, Uniform Oil was required to prove that the transactions in question had a "not insubstantial" effect upon interstate commerce. Northern Pacific Ry. v. United States, 356 U.S. 1, 6, 78 Sup.Ct. 514, 2 L.Ed.2d 545 (1958).

Uniform Oil established that it purchased some petroleum products—an undefined quantity—from a refinery in Billings, Montana. This refinery obtained its crude oil from the Elk Basin Field in Wyoming. Uniform Oil also made purchases from a refinery in the Kevin-Sunburst Field in Montana. There is no evidence as to the volume or dollar amount of the purchases which Uniform Oil made from these two refineries. Uniform Oil honored all major oil company credit cards under an arrangement to be paid for such credit sales through credit-card processing by an oil company located in Spokane, Washington. Submission of the accounts by Uniform Oil and payment by this other oil company was to be accomplished by mail. But Uniform Oil offered no evidence to establish its gross or net sales or the amount or portion of sales, if any, which were completed by credit-card payment through interstate commerce. Uniform Oil introduced no other evidence relating to the effect which its business, or any decline thereof, would have upon interstate commerce.[2]

---

1. This issue was one of the grounds offered by the appellees to the District Court in support of their motion for a directed verdict. The District Court, however, apparently did not reach the point of ruling upon this question.

2. The only evidence introduced at the trial with regard to the effect of the business upon interstate commerce is the following direct testimony of the president of Uniform Oil:

"Q Now, would you please describe your operation with regard to credit cards?

"A We took all credit cards. We accepted the credit cards of all of the major companies, and they, in turn, were taken by our supplier, who charges us a flat rate of six percent of the cost of the purchases for handling the credit cards, and no recourse on the part of the supplier to us. Once we turned in the credit cards to our supplier, why, we were through with them.

"Q And where was your supplier located?

"A Well, the Big West Oil Company is a Montana corporation, its principal place of—its principal office, however, is in the Hutton Building in Spokane, Washington.

"Q And what kind of credit cards did you accept in the business?

"A We accepted the Big West credit cards and all other credit cards—Phillips; Enco; Standard Oil of New Jersey; Standard Oil of California—all of them.

"Q How were they processed?

"A They were turned into the Big West Oil Company and credited against

Therefore, assuming that there was involvement with interstate commerce in the appellant's operation, there was nothing upon which the jury might have based an assessment of the substantiality of that involvement. Such proof may have been, and probably was, readily available. Nevertheless, it was not produced, and speculation as to its probable availability cannot cure the manifest insufficiency of evidence upon the record and be held to supply the required proof that the effect was "not insubstantial." The absence of such indispensable proof deprived the District Court of jurisdiction over the Sherman Act claims.

"Whether a purely local or intrastate conspiracy unreasonably restrains interstate commerce is primarily a factual question, i. e. does the local price fixing conspiracy affect substantially the flow of interstate commerce? If the answer is yes, then only are we concerned with the effect of the price-fixing under the per se doctrine. In fact, unless there is a finding that the local and intrastate activities complained of and as alleged in the indictment, substantially affected interstate commerce, there is no jurisdiction in a district court over the alleged Sherman Act violation."

Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 747 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

Affirmed.

our account with them, less the six percent carrying charge.

"Q They were processed in Spokane, Washington?"

\* \* \* \* \*

"Q Now, John, do you know where the gas originated that came into your station?

"A We took gasoline from two places: We took directly from the refinery, which is located at Sunburst, up in the Kevin-Sunburst Field, and we took from the pipe line, which is the Yellowstone Pipe Line from Billings, Montana, and that has a station here in Helena. This is one of the points of the pipe line.

"Q Does the pipe line run interstate?

"A Yes, it does. It goes to Spokane.

"Q This Kevin Field, that is within Montana?

"A Yes, it is.

"Q Did they sell—do they handle a particular type gasoline like Conoco?

"A That is the Big West Refinery, they have exchanged it with the major companies and they draw from the pipe line here also.

"Q What I was wondering, how do you know what kind of gas, how did you know what kind of gasoline you were getting from the pipe line?

"A We had our choice. We would purchase lots of seven thousand gallons from the Big West Refinery at Kevin, and we would take in loads of eight thousand gallons from the pipe line. So it pretty well determined what we had in the way of storage at the time we ordered gasoline.

"Q What other companies' gasoline are transmitted through the pipe line, or were at that time?

"A Well, the pipe line was owned by the various major refineries. Carter at that time; now Hinkle, or Humble; Continental; Union, which also has its own refinery in Montana; Enco, and I believe Husky. And the refined product which was going through that pipe line was refined in Billings, mostly from crude, from the Elk Basin Field in Wyoming."