CARTRADE, INC., a corporation,
Plaintiff-Appellant,

v.

FORD DEALERS ADVERTISING ASSO-
CIATION OF SOUTHERN CALIFOR-
NIA, a corporation, and Ford Motor
Company, a corporation, Defendants-Ap-
pellees.

No. 24447.

United States Court of Appeals,
Ninth Circuit.

Aug. 13, 1971.

Jack Corinblit (argued), of Corinblit & Shapero, Los Angeles, Cal., for plaintiff-appellant.

F. B. Yoakum, Jr. (argued), Walter Bruder, Jr. (argued), of Trippet, Yoakum & Ballantyne, Getz, Aikens & Manning, Los Angeles, Cal., for defendants-appellees.

Before BARNES and DUNIWAY, Circuit Judges, and SOLOMON, District Judge.*

DUNIWAY, Circuit Judge:

Cartrade, Inc. brought suit for damages, alleging that the Ford Dealers Ad-

* Honorable Gus J. Solomon, United States District Judge, District of Oregon, sitting by designation.

vertising Association of Southern California (FDAA) and the Ford Motor Company (Ford) had conspired to destroy Cartrade's business, in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). The case was tried before a jury. The issue of liability was tried first, and after Cartrade rested, the trial court granted directed verdicts in favor of both defendants, and entered judgment in their favor. Cartrade appeals; we affirm.

The motions for directed verdict were based upon two grounds: that no substantial effect on interstate commerce was shown, and that, if there were some such effect shown, still, as a matter of law, no violation of the anti-trust laws was shown. The trial court rested its decision solely on the first ground.

### 1. The Facts.

We state the facts most favorably to Cartrade. Here is what the record shows.

### a. The Parties.

Ford is a motor car manufacturer, doing a nationwide business, and selling its cars to franchised retail dealers. FDAA is a nonprofit corporation, whose members are all of the franchised Ford dealers in Southern California, numbering 143, plus one dealer in Las Vegas, Nevada. FDAA acts as a trade association whose primary function is to advertise and promote the sales of Ford products in its area. For each car bought from Ford by a member dealer Ford pays $20.00 to FDAA; this is the sole source of FDAA's funds. Appellant Cartrade is a California corporation owned by Mrs. Adele Robinett, and having an office in Hollywood, California. It is the successor to Cartrade Association, an unincorporated business formed in 1955 whose proprietor was Mrs. Robinett.

### b. The commerce involved.

In 1965 there were 120,900 new cars sold by Ford to Ford dealers in the Southern California sales district; the estimated dollar value of the sales was $329,-720,000. Of the 120,900 cars, 28,300 were completely assembled outside of California; the estimated dollar value of the sales of these 28,300 cars to the dealers was $81,240,000. The remaining 92,-600 were at least partially assembled in California. However, in 1965 Ford had no manufacturing plant in California, so that all the components finally assembled in California had themselves moved in interstate commerce. The estimated dollar value of those components for 1965 was $347,100,000.

### c. Cartrade's place in the commerce involved.

The term "Cartrade" is misleading. Cartrade has never bought or sold or traded cars. Rather, it renders a point-of-sale service to dealers who are selling cars to customers. Ford makes many types and models of cars. They come in a great variety of body styles, colors, upholstery, and trim, and they carry a bewildering variety of accessories and extras. Thus it is not feasible for any dealer to carry all of them in stock. If a particular customer wants a certain model with particular styling, equipment, and accessories and the dealer does not have the car in stock, he may lose the sale, either to another Ford dealer or to a competing dealer selling another make. That is where the cartrader comes in.

If the dealer wished to, he could telephone each of the other 140-odd dealers in the area to ask whether that dealer had the desired car. If he found such a dealer, he could then trade a car in his own stock for the desired car, and thus save the sale. As a practical matter, however, the dealer cannot afford that sort of chancy and time-consuming effort. So he turns to a "cartrader" specializing in Ford cars. He tells the cartrader what specific car he wants. The cartrader maintains up-to-date inventory lists of its client dealers' stocks of cars and checks the lists to see whether any dealer has the desired car in inventory. If one of them has, the cartrader notifies the inquiring dealer, who then calls the other dealer and offers to trade. Sometimes a dealer called by a cartrader

will want a particular model Ford in exchange; in that case, the cartrader can tell him whether the inquiring dealer has such a car, and, if he does not, what other cars he does have that might interest the called dealer. On occasion, the inquiring dealer will not want to part with any of the cars in his stock that the called dealer requests in return. In such a case, the inquiring dealer may simply buy the car he wants from the called dealer. However, this seldom happens.

As an alternative to using a cartrader, the dealer could order the desired car directly from Ford. The disadvantage of ordering from the factory is the time-lag involved in getting the car; if the customer is impatient, the dealer may lose the sale. The value of an available cartrading service to a dealer is evident.

From 1951 through 1955, Mrs. Robinett had been employed by Dealers Exchange, another cartrader. From 1955 to 1965, both Dealers Exchange and Cartrade served as cartraders for Ford dealers in Southern California. On January 14, 1965, Cartrade bought out Dealers Exchange, and on January 26, Cartrade contracted with FDAA to become the exclusive cartrading agency for all Ford dealers belonging to FDAA.

During the period from 1960 to January 1965, both Cartrade and Dealers Exchange received dealer inventory lists from Ford's district sales office for Southern California. During the period from February 1, 1965, to February 28, 1966, Cartrade was the exclusive cartrading agency for FDAA, and it alone received the inventory lists. Cartrade paid Ford approximately $125 per month for the lists. The lists were compiled in the following manner: When a Ford car was released by the factory to the carrier for shipment to the dealer, an IBM card containing a complete description of the car was sent to the dealer. A duplicate card went to Ford's district sales office. Using the IBM cards, the district sales office prepared computer print-out current inventory lists for all the Ford dealers in the Southern California district.

Before Ford's adoption of this computerized inventory procedure, Cartrade had obtained inventory information directly from the many Ford dealers, by telephone. The information was entered by hand on large sheets of paper, in tabular form. The parties agree that, with the proliferation of Ford models, styles, and accessories since 1960, it is no longer practicable for a cartrader to compile its own lists by hand. If one Ford cartrader does not receive the IBM inventory lists it will not be competitive with another Ford cartrader that does receive them.

d. *The conduct complained of.*

Cartrade's contract with FDAA provided:

"1. * * * That [FDAA] shall pay annual membership fees [to Cartrade] amounting to $180.00 for each of its members for the year commencing February 1, 1965, to and including January 31, 1966. * * *

2. That the initial term of this agreement shall be February 1, 1965, to and including January 31, 1966, and thereafter [FDAA] shall have the option of renewing the same each year for an additional term of one year, commencing on the first day of February in each year. * * * Provided, further, that either party hereto may terminate this agreement at any time on six months' notice in writing to the other. * * * The fee during any such succeeding year shall be $180.00 per member of [FDAA]. * * * That each dealer member shall pay [Cartrade] directly, $3.00 for each individual transaction wherein a motor vehicle is sought and acquired by such dealer member through the information facilities of [Cartrade]."

In early January, 1966, Mrs. Robinett was notified by FDAA that the contract would not be renewed for an additional year, but that FDAA would like to continue its relationship with Cartrade on a

month-to-month basis. The month-to-month arrangement commenced on February 1, 1966. In mid-February Mrs. Robinett was told that the arrangement would be terminated at month's end. It was, and Cartrade ceased doing business on March 1, 1966. Since then, FDAA has obtained its cartrading services exclusively from a new cartrading organization, called Dealers Trade. When Cartrade ceased business, two of its employees went to work for Dealers Trade.

In February 1966, Ford decided no longer to make its IBM lists available to Cartrade. Instead, it agreed to supply the lists only to FDAA, which in turn supplied them only to Dealers Trade, the new cartrading organization. At about the same time, the FDAA decided to terminate its month-to-month exclusive arrangement with Cartrade. These decisions effectively eliminated Cartrade as a viable cartrading agency.

Cartrade claims that Ford and FDAA conspired illegally to set up Dealers Trade, to supply the IBM inventory lists only to Dealers Trade, to induce Cartrade's employees to go to work for Dealers Trade, and thereby intentionally to put Cartrade out of the cartrading business and to permit Dealers Trade to monopolize the Southern California Ford cartrading business.

## 2. *Interstate Commerce.*

■ There can be no doubt that Ford, in selling its cars to Southern California dealers, and FDAA's members, in buying those cars, are in interstate commerce. Moreover, we have no doubt that the resales of cars by FDAA members to their customers are an essential part of the flow of interstate commerce. To say the least, these resales directly affect interstate commerce. Without those resales, there would be no interstate commerce in Ford's cars or in components to be assembled into Ford's cars. The fact that the ownership of a car purchased by an FDAA member dealer passes to the dealer from Ford at the time the car is released by Ford to the carrier for delivery to the dealer does not affect the foregoing conclusion.

Cartrade's activities facilitated the resale of Ford cars by Ford dealers. It operated at the nexus between the interstate sales by Ford to the dealers and the intrastate resales by dealers to customers. We think that it would be quite unrealistic to say that Cartrade's activities did not affect interstate commerce. Indeed, it seems more realistic to us to say that Cartrade was "in" interstate commerce, although we need not go so far.

There is evidence that while Cartrade had its exclusive arrangement with FDAA it effected about 1400 trades per month or 16,800 trades per year—a by no means minuscule business. At $2,900 per car, this would amount to over $40,-000,000 worth of cars involved in trades. The annual fees from FDAA members, plus $3.00 per trade, would bring Cartrade a gross income in excess of $76,-000.

It is no answer to say that there is no evidence that the vehicle-locating services provided by Cartrade ever involved a trade, or an attempted trade, or even an inquiry concerning a possible trade, between Ford dealers in different states. It is not necessary that the business be "in" interstate commerce; it is enough that it substantially "affect" interstate commerce.

## 3. *Violation of the anti-trust laws.*

The question remains, however, granted that Cartrade's business affected interstate commerce, whether what happened to Cartrade violated the anti-trust laws. Many things happen, either "in" or "affecting" such commerce, that do not violate the anti-trust laws.

We hold that Cartrade has failed to show a violation of the anti-trust laws. In so holding, we assume that the evidence would support several factual findings: (a) that Ford and FDAA agreed to terminate Cartrade's services to FDAA members and turn the business over to Dealers Trade, (b) that both agreed that

FDAA was going to do business with but one cartrader, Dealers Trade; (c) that both knew that no cartrader could succeed without the IBM inventory lists, and (d) that both intended that only Dealers Trade would get the lists.

Our reasons are two. First, there is no evidence that the substitution of Dealers Trade for Cartrade had any effect upon interstate commerce in Ford cars. Second, there is no evidence that the defendants, in bringing about the substitution, had, as a primary purpose, putting Cartrade out of business or compelling it to conform to any anticompetitive practices.

■ First, there was no effect upon commerce in Ford cars. Cartrading among Ford dealers in Southern California is not a means of promoting competition between those dealers. As between them, it is a mutual backscratching operation designed to minimize the chance that any of them will lose a sale. Its value is to promote good will for each dealer, by enabling him to meet his customer's wants, and for Ford cars by assuring prompt delivery of the specific car desired. Its competitive effect is to avoid loss of customers to other dealers selling other cars that compete with Ford's. As Evans, a Ford representative testified:

"The ability to supply a car at a given moment when a customer wants it will increase our total sales. For example, if a customer comes to a dealer's place of business and asks for a car with a particular style and color and it is unavailable, it is entirely possible that that customer will go elsewhere and perhaps go to competition to purchase a car. So if we can provide the car at the given instant, we will save the sale."

As to this type of competition, there is not a shred of evidence that the switch from Cartrade plus Dealers Exchange (2 Ford cartraders) to Cartrade as the only Ford cartrader, in January, 1965, or from Cartrade to Dealers Trade in March,

1966, had the slightest effect upon it. In relation to the 1965 switch, when Cartrade became the only Ford cartrader, all that counsel can point to is Mrs. Robinett's testimony. She said that in a conversation with Evans she told Evans that Lewis, the operator of Dealers Exchange, which she had purchased,

"had misrepresented his contract to us. He had not been doing the amount of trades that we had been doing, and he had told us he was. We thought we had—the business was better in competition as far as we were concerned, you know, because we had been making 900 trades in competition and he said he had been making 900 trades. That would make 1800 trades per month [prior to the merger of Cartrade and Dealers Exchange], and we just weren't making 1800 trades per month [following the merger]. So he had misrepresented his contract. * * * "

Mrs. Robinett testified that she then said to Evans,

"Wouldn't it be better to be in competition? That way you would be delivering more cars. If he [the new cartrader] was doing 900 trades and we were doing 900 trades, that would be 1800 trades per month, and it would be —now we are only making 1400 per month, so you are not delivering as many cars."

Mrs. Robinett testified that Evans then said,

"Yes, maybe it would be [better to have competing cartraders] if that is the case."

Cartrade argues that Evans' response constituted an admission "that two car trading organizations and competition between them would be better for Ford." It did not. Mrs. Robinett quoted Evans as favoring competing cartraders "if that is the case"—*i. e.*, if the figures that Mrs. Robinett had given him were correct. Evans did not admit that they were; Mrs. Robinett did not say that they were; her statement to Evans was that they were false. To predicate lia-

bility for treble damages in an anti-trust case upon such testimony is to make a mockery of the burden of proof, which rests on the plaintiff. There is no other evidence to which Cartrade points.

Even if the figures were accurate, they would show only that the number of *cartrades* decreased when there was one cartrader rather than two. That fact may mean any number of things. It may mean that Ford lost sales in Southern California to its competitors. It may mean that Ford's net sales remained constant, but that customers went to different Ford dealers to obtain their desired models when the dealers they first approached were unable to make the trades. Or it may mean that Ford customers who wanted unavailable models accepted substitutes from the first Ford dealers they visited, or waited for the dealers to order the desired models from the factory. Nothing in the record even hints at which of these possible consequences ensued, let alone that any of them ensued *because of* the absence of a competing cartrader.

In relation to the 1966 switch, from Cartrade to Dealers Trade, counsel cites nothing in the record, and we can find nothing, about its effect upon competition in the sale of Ford cars. For all that appears, Dealers Trade may have arranged for twice the number of trades that Cartrade arranged.

In short, we find no evidence that the conduct complained of had any effect, much less a "not insubstantial effect" on commerce in Ford cars. Northern Pacific Ry. v. United States, 1958, 356 U.S. 1, 6, 78 S.Ct. 514, 2 L.Ed.2d 545; Uniform Oil Co. v. Phillips Petroleum Co., 9 Cir., 1968, 400 F.2d 267, 269.

■ The only other conceivable basis for liability is the effect of what the defendants did upon the business of "car-trading" in Ford cars. As to that, obviously Cartrade was hurt; it lost the business and Dealers Trade got it. But in this setting that is not a basis for finding liability. Cartrade does not argue that it is illegal for FDAA to deal with cartraders in behalf of its members. It posits liability on the notion that it is wrong for FDAA to decide to deal only with one cartrader, and that the one will not be Cartrade. That, however, is not enough. There is here no evidence whatever that these decisions were made for anti-competitive reasons, or that the defendants dumped Dealers Exchange in favor of Cartrade, or Cartrade in favor of Dealers Trade, for anti-competitive reasons. In the absence of proof, the presumption is that their reasons were lawful; that they believed Cartrade alone would do a better job of helping the dealers to compete with sellers of other makes than the combination of Cartrade and Dealers Exchange, and that Dealers Trade would do a better job than Cartrade was doing. We can see how a single cartrader, having in its possession the inventory of every Ford dealer, might do —or in good faith be believed by the dealers to be likely to do—a better job for the dealers, with less expense to them and less waste of their time than competing cartraders would be able to do. And we can think of innumerable reasons why FDAA and its members, and Ford as well, may have become dissatisfied with the services of Cartrade. To find liability here would be to saddle the dealers with Cartrade's services forever. The principles we applied in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 9 Cir., 1969, 416 F.2d 71, 74–80, are applicable here.

Burke v. Ford, 1967, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554, is not here in point. It involved a statewide agreement between all liquor wholesalers to divide markets both by territories and by brands. The anti-competitive effect of such a *per se* violation is too obvious to require proof; so is its effect on the movement of liquor in interstate commerce. Not so here.

Affirmed.