William J. RASMUSSEN, Plaintiff-Appellant,

v.

The AMERICAN DAIRY ASSOCIATION, a corporation, et al., Defendants-Appellees.

No. 26302.

United States Court of Appeals, Ninth Circuit.

Dec. 29, 1972.

Rehearings Denied Jan. 30, 1973.

Henderson Stockton (argued), of Stockton & Hing, Hill & Savoy, Phoenix, Ariz., for plaintiff-appellant.

David William West (argued), Newman Porter, of Evans, Kitchel & Jenckes, Richard J. Burke, U. S. Atty.,

Gary K. Nelson, Atty. Gen., Phoenix, Ariz., Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, Ryley, Carlock & Ralston, Phoenix, Ariz., G. Hal Taylor, Salt Lake City, Utah, H. M. Beggs, of Carson, Messinger, Elliott, Laughlin & Ragon, Phoenix, Ariz., John A. Haas, Mount Prospect, Ill., Keith G. Mumby, Grand Junction, Colo., Richard L. Schrepferman, of Holme, Roberts & Owen, Denver, Colo., for defendants-appellees.

Before MADDEN,[*] Judge of the United States Court of Claims, and BROWNING and DUNIWAY, Circuit Judges.

BROWNING, Circuit Judge:

William Rasmussen, the processor and distributor of a "filled milk" product[1] called "Go," appeals from a summary judgment dismissing his Sherman Act suit, 15 U.S.C. §§ 1–7, against various dairy associations and dairy association officials. The district court found jurisdiction lacking under the Sherman Act.

### I. The Facts

The relevant facts, drawn from the complaint and the parties' stipulation,[2] are as follows.

Plaintiff is a "producer-handler[3] of fluid milk in the Phoenix, Arizona, marketing area. In March 1965 he introduced "Go" into that market. "Go" is made in Arizona by adding local water to other ingredients, including dried milk, brought in from other states. The product was well received. During 1968 sales totaled 863,377½ gallons, and profits $36,720.

In December 1966 defendants entered into a conspiracy to restrain trade and create a monopoly by driving plaintiff's "Go" and other filled milk beverages from the Arizona market. Defendants agreed to accomplish this purpose by (1) causing the Central Arizona Milk Marketing Order to be amended to reclassify "Go" and other filled milk products as "Class I" milk, knowing that the resulting increase in cost would prohibit sale of these products:[4] (2) sponsoring legislation to eliminate filled milk products from Arizona markets and create a whole milk monopoly; (3) engaging in a widespread false advertising campaign, misrepresenting and disparaging "Go" and other similar filled milk products;[5] and (4) causing defendant Ezra Odle, Dairy Commissioner of the State of Arizona and also a director of the United Dairymen of Arizona, to issue in his official capacity certain regulations restricting and conditioning the manufacture, labeling, display, and sale of "Go" and other filled milk products.

Two lines of commerce are involved. The first line of commerce "involved, burdened, and restrained and otherwise

---

[*] Honorable J. Warren Madden, Senior Judge of the United States Court of Claims, sitting by designation. Judge Madden heard oral argument and voted to reverse, but died before the opinion was circulated.

1. See 7 C.F.R. § 1131.18 (1972).

2. At the hearing on defendants' motion for summary judgment, the parties entered into a stipulation for purposes of the motion. The district court stated the stipulation as follows:

   "The plaintiff is, and at all times relevant to this action has been, engaged in the business of manufacturing and selling a beverage product called 'Go'. All ingredients, with the exception of water, used in the manufacture of 'Go' are purchased by plaintiff from outside of the State of Arizona and are delivered to him at his Glendale, Arizona plant. Then, in Arizona, plaintiff combines and processes these ingredients with Arizona water, manufacturing the product 'Go'. Plaintiff sells 'Go' exclusively within the State of Arizona, 'Go' being a filled milk banned from interstate commerce under 21 U.S.C. §§ 61, 62. There are no other business activities of plaintiff which are alleged to be restrained by defendants' acts."

3. See 7 C.F.R. § 1131.11 (1972).

4. See Rasmussen v. Hardin, 461 F.2d 595, 596–597 (9th Cir. 1972).

5. It is alleged that "due alone to the said advertising campaign," sales of "Go" in the Phoenix area dropped about 25% in a six-month period.

illegally controlled" by defendants is "that portion of the Interstate Commerce in which milk is produced in the State of Arizona and in other States and thereafter shipped to purchasers in the State of Arizona for the purpose of processing, pasteurizing, manufacturing and offering for sale to the consumers in the State of Arizona and elsewhere." [6] The second line of commerce is that in which "Go"'s out-of-state ingredients flow into Arizona, are combined with local water, and are sold and distributed in the Arizona Marketing Area as "Go." [7] "[E]very ingredient used in the manufacture of the product 'Go,' other than Arizona water, is wholly produced, manufactured and moves in interstate commerce from States outside Arizona into Arizona . . . for delivery to [plaintiff] . . . in Phoenix, Arizona."

The Secretary of Agriculture has determined that the "stream of commerce" in milk constitutes interstate commerce, and that all activities "in the field of milk or activities related thereto" burden, obstruct, or interfere with this stream of interstate commerce in milk and therefore are subject to regulation by the Secretary under 7 U.S.C. § 608c. The Secretary has further determined that plaintiff's activities in processing and selling "Go" are either in this stream of interstate commerce or burden, obstruct, and interfere with it, and therefore are subject to regulation by the Secretary under the provisions of the statute. The acts of the defendants complained of were based upon, or were related to, the Central Arizona Milk Marketing Order, 7 C.F.R. § 1131, issued by the Secretary under the statute to regulate this stream of commerce.[8]

Finally, plaintiff alleges that defendants' wrongful acts were "in aid of and in pursuance of the design of monopolization, price enhancement, restifling and restriction of competition" in the described commerce, and "were for the purpose of injuring Plaintiffs' business and property and to restrain trade and to create a real milk monopoly."

## II.  *The Ruling Below*

Focusing on the second of the two lines of commerce allegedly restrained —commerce in "Go" and its ingredients —the district court held plaintiff's allegations insufficient as a matter of law to give the court subject-matter jurisdiction under the Sherman Act. According to the court, "plaintiff's business is of a local nature and interstate commerce is not substantially and adversely affected by an alleged re-

---

6. The defendants include the American Dairy Association, and state trade associations of dairymen in Arizona, Colorado, Utah, and South Dakota.

7. This second line of commerce—in "Go" and its ingredients—is the only one directly referred to in the stipulation. *See* note 2. The first line of commerce—in fluid milk—is alleged in detail in the complaint. The stipulation does not purport to cover all of the factual matters alleged in the complaint. The allegations of the complaint remain in the case, and are to be taken as true on the motion for summary judgment, except as they may be contradicted by the stipulated facts, affidavits, or other material properly submitted to the court. *Cf.* Hiern v. St. Paul-Mercury Indemnity Co., 262 F.2d 526, 529 (5th Cir. 1959). No such inconsistency appears.

8. 7 U.S.C. § 608c(1) provides:

"The Secretary of Agriculture shall, subject to the provisions of this section, issue, and from time to time amend, orders applicable to processors, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof specified in subsection (2) of this section. Such persons are referred to in this chapter as 'handlers.' *Such orders shall regulate, in the manner hereinafter in this section provided, only such handling of such agricultural commodity, or product thereof, as is in the current of interstate or foreign commerce, or which directly burdens, obstructs, or affects, interstate or foreign commerce in such commodity or product thereof*" (emphasis added). Pursuant to this section, the Secretary has issued the Central Marketing Order, 7 C.F.R. § 1131 (1972), regulating the handling of both fluid and filled milk in the Phoenix area.

straint applied to that business simply because plaintiff uses ingredients in his product which are produced out of state."[9]

In the discussion that follows, the jurisdictional test to be applied under the Sherman Act is first defined. The test is then applied to the line of commerce with which the district court was primarily concerned—the one involving "Go" and its ingredients. Finally, the test is applied to the other allegedly affected line of commerce—the one in fluid milk.

### III. *The Test*

■ "That Congress [in passing the Sherman Act] wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements . . . admits of little, if any, doubt. The purpose was to use that power to make of ours, so far as Congress could under our dual system, a competitive business economy." United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 558–559, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944).[10] The reach of the Sherman Act is "as inclusive as the constitutional limits of Congress' power to regulate commerce." Report of the Attorney General's National Committee to Study the Antitrust Laws 62 (1955). As judicial construction of the commerce clause has expanded over the years to reflect changing evaluations of the necessary scope of the federal commerce power, so too has the reach of the Sherman Act.[11]

In short, the conduct of the defendants is within the jurisdictional reach of the Sherman Act if Congress can prohibit that conduct under the commerce clause.

■ Before this general test is particularized, an important distinction should be stressed—the distinction between the jurisdictional question, with which we are concerned, and the question of whether, in other respects, a substantive violation of the Sherman Act is alleged.

The two problems are frequently confused, and understandably so. *See* P. Areeda, Antitrust Analysis 59–60 (Little, Brown & Co. 1967). Section 1 of the Act prohibits contracts, combinations, and conspiracies "in restraint of trade or commerce among the several States." This single cryptic phrase defines both the conduct prohibited by the Act and the statute's jurisdictional reach. As the Court explained in Apex Hosiery Co. v. Leader, 310 U.S. 469, 494–495, 60 S.Ct. 982, 992, 84 L.Ed. 1311 (1940): "[T]he phrase 'restraint of trade' which . . . had a well-understood meaning at common law, was made the means of defining the activities prohibited. The addition of the words 'or commerce among the several states' was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the

---

9. Primary reliance was placed by the court on this court's decisions in Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th Cir. 1969), and Page v. Work, 290 F.2d 323 (9th Cir. 1961).

10. *Accord:* United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 298, 65 S.Ct. 661, 89 L.Ed. 951 (1945) ; Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311 (1940) ; Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 435, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). *See* Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 739 (9th Cir. 1954) : "In the enactment of the Sherman Act Congress exercised its full power over interstate commerce."

11. *See* Note, The Commerce Requirement of the Robinson-Patman Act, 22 Hastings L.J. 1245, 1247–55 (1971). *Compare, e. g.,* United States v. E. C. Knight Co., 156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895), *with* Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) ; Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948) ; United States v. Women's Sportswear Mfrs. Ass'n, 336 U.S. 460, 69 S.Ct. 714, 93 L. Ed. 805 (1949) ; and Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

prohibited restraint of trade to interstate commerce for constitutional purposes. . . . " The same general distinction is drawn in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 235, 68 S.Ct. 996, 92 L.Ed. 1328 (1948), and United States v. Women's Sportswear Manufacturers' Ass'n, 336 U.S. 460, 461–462, 69 S.Ct. 714, 93 L.Ed. 805 (1949).

■ Whether a defendant's conduct constitutes a substantive Sherman Act violation is entirely a matter of congressional definition: Is the defendant's conduct the type of conduct Congress intended to prohibit? Is that conduct a "restraint of trade" within the meaning of section 1, or an "attempt" or "conspiracy" to "monopolize . . . trade" within the meaning of section 2? The jurisdictional question, on the other hand, concerns Congress' power to reach the defendant's conduct: "[T]he restraint must 'occur in or affect commerce between the states . . . *for constitutional reasons.*'" Klor's, Inc. v. Broadway-Hale Stores, 255 F.2d 214, 224 (9th Cir. 1958) (emphasis added), *reversed on other grounds,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), quoting and discussing Apex Hosiery Co. v. Leader, *supra.*

We are concerned in this case only with the jurisdictional question. We assume, but expressly do not decide, that the conduct charged constituted a "restraint of trade," or an "attempt" or "conspiracy" to "monopolize . . . trade." Our sole inquiry is whether the prohibition of that conduct falls within "the utmost extent of [Congress'] . . . Constitutional power." United States v. South-Eastern Underwriters' Ass'n, *supra.*

■ On its face, this test is extremely broad. Congress' power over interstate commerce is plenary, encompassing not only the regulation of interstate commerce itself, but all measures "necessary and proper" to that end, including the regulation of commerce that is purely intrastate.[12]

■ The "necessary and proper" standard is met if the regulated conduct has a "substantial economic effect" upon interstate commerce. As the Court said in Wickard v. Filburn, 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942): "[E]ven if . . . [the] activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as 'direct' or 'indirect'."[13]

12. In Houston & Texas Ry. v. United States (Shreveport Rate Case), 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), the Court held that Congress may control rates charged by carriers for transportation entirely within a state if such regulation is necessary to prevent discrimination against interstate traffic. As the Court said, "This is not to say that Congress possesses the authority to regulate the internal commerce of a State, as such, but that it does possess the power to foster and protect interstate commerce, and to take all measures necessary and appropriate to that end, although intrastate transactions of interstate carriers may thereby be controlled." *Id.* at 353, 34 S.Ct. at 837. *Accord:* Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 232 n. 11, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); United States v. Wrightwood Dairy Co., 315 U.S. 110, 118–119, 62 S.Ct. 523, 86 L.Ed. 726 (1942); United States v. Darby, 312 U.S. 100, 118–119, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

13. *See* Stern, The Scope of the Phrase Interstate Commerce, 41 A.B.A.J. 823, 871 (1955), in Selected Essays on Constitutional Law: 1938–1962, at 298 (Comm. of Ass'n of Am. L. Schools, eds., West Pub. Co., 1963).

In Wickard v. Filburn, quoted in the text, the Court upheld the power of Congress to limit the amount of wheat farmers may grow in their own fields for their own use because the interstate market may be affected by the reduction in market demand resulting from the self-satisfaction of the needs of such farmers for wheat.

In United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed.

Or as the Court said in Heart of Atlanta Motel v. United States, 379 U.S. 241, 255, 85 S.Ct. 348, 356 3 L.Ed.2d 258 (1964), quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196–197, 6 L.Ed. 23(1824): "[T]he determinative test of the exercise of power by the Congress under the Commerce Clause is simply whether the activity sought to be regulated is 'commerce which concerns more States than one' and has a real and substantial relation to the national interest."

■ As the wording of these passages suggests, the power of Congress over commerce among the states is not a "technical legal conception," divorced from economic reality. *See* United States v. South-Eastern Underwriters' Ass'n, *supra*, 322 U.S. at 547, 64 S.Ct. at 1170. "[T]he conditions of transportation and commerce have changed dramatically" over the years, and the constitutional principle must be applied "to the present state of commerce." Heart of Atlanta Motel v. United States, *supra*, 379 U.S. at 251, 85 S.Ct. at 354. As Justice Cardozo noted in his dissent in Carter v. Carter Coal Co., 298 U.S. 238, 328, 56 S.Ct. 855, 880, 80 L.Ed. 1160 (1936), the words and phrases used to define the commerce power must be interpreted "with suppleness of adaptation and flexibility of meaning. The power is as broad as the need that evokes it." Whether the requisite "substantial economic effect" or "substantial relation to the national interest" is present or absent is a practical, case-by-case economic judgment, not a conclusion derived from application of abstract or mechanistic formulae. Mandeville Island Farms v. American Crystal Sugar Co., *supra*, 334 U.S. at 232–233, 68 S.Ct. 996; United States v. South-Eastern Underwriters' Ass'n, *supra*, 322 U.S. at 546–547, 64 S.Ct. 1162; Wickard v. Filburn, *supra*, 317 U.S. at 119–125, 63 S.Ct. 82.[14]

726 (1942), a case of particular significance here, the Court held that because Congress may regulate the price of milk moving in interstate commerce it may also regulate the price of milk produced, purchased, processed, and sold entirely within a state when the intrastate milk competes with milk shipped in interstate commerce. *See id.* at 121, 62 S.Ct. at 527.

"[T]he national power to regulate the price of milk moving interstate into Chicago, Illinois, marketing area, extends to such control over intrastate transactions that there as is necessary and appropriate to make the regulation of the interstate commerce effective; and . . . it includes authority to make like regulations for the marketing of intrastate milk whose sale and competition with the interstate milk affects its price structure so as in turn to affect adversely the Congressional regulation."

*See also* Burke v. Ford, 389 U.S. 320, 321, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

The principle applied in these and similar decisions is applicable to cases under the Sherman Act. As the Court said in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 232 n. 11, 68 S.Ct. 996, 1004, 92 L.Ed. 328 (1948), "Once applied to transportation and the Interstate Commerce Acts, it was inevitable that the approach would be extended to the productive and industrial phases of the national economy and the statutes regulating them, including the Sherman Act."

The reverse is also true. Sherman Act decisions are commonly cited in sustaining other federal economic regulations of local commerce. For example, *Wrightwood Dairy*, an Agricultural Marketing Agreement Act case, rests upon cases holding that "[c]ompetitive practices which are wholly intrastate may be reached by the Sherman Act because of their injurious effect on interstate commerce." 315 U.S. at 120, 62 S.Ct. at 526.

14. *See* P. Benson, Supreme Court and the Commerce Clause 101 (Dunellen 1970).

As the Court said in NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 41–42, 57 S.Ct. 615, 626, 81 L.Ed. 893 (1937): "We have often said that interstate commerce itself is a practical conception. It is equally true that interferences with that commerce must be appraised by a judgment that does not ignore actual experience."

And in North American Co. v. SEC, 327 U.S. 686, 705, 66 S.Ct. 785, 796, 90 L.Ed. 945 (1946), "Commerce itself is an intensely practical matter. . . . To deal with it effectively, Congress must be able to act in terms of economic and financial realities. The commerce clause gives it authority so to act."

■ A demonstrable quantitative effect is not necessary: "[T]he power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities . . . which *might* have a substantial and harmful effect upon that commerce." Heart of Atlanta Motel v. United States, *supra*, 379 U.S. at 258, 85 S.Ct. at 358 (emphasis added).

■ In essence, the test is whether "[t]he facts of the particular situation . . . determine . . . [that the] relationship to interstate commerce is too tenuous in a practical sense to warrant federal control." *See* Stern, The Commerce Clause and the National Economy, 1933–1946 (Part 1), 59 Harv. L.Rev. 645, 673 (1946) (discussing Justice Cardozo's dissent in Carter v. Carter Coal Co., *supra*).

■ A caveat is in order. When Congress itself determines that particular conduct adversely affects interstate commerce, the courts defer to Congress' judgment so long as there is "a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce. . . ." Katzenbach v. McClung, 379 U.S. 294, 303–304, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).[15] However, under the Sherman Act, "Congress has . . . left it to the courts to determine whether the intrastate activities have the prohibited effect on . . . [interstate] commerce. . . ." United States v. Darby, 312 U.S. 100, 120, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941). While the underlying standard remains the same, the judicial function is not that of reviewing a decision made by Congress, but rather that of determining in the first instance whether the facts permit the exercise of power under the commerce clause. The court may not stop with a determination that there would be a "rational basis" for regulating the defendant's conduct. The court must itself decide whether the defendant's conduct is sufficiently related to interstate commerce to justify the prohibition of that conduct as "necessary and proper" to the protection of interstate commerce against the presumed economic burdens resulting from the anticompetitive practices.[16]

## IV. *Commerce in "Go" and Its Ingredients*

We turn to whether the complaint, read in the light of the stipulated facts, alleges conduct having a sufficient impact upon interstate commerce in the ingredients of "Go" to bring it within the regulatory power of Congress under the commerce clause, as manifested in the Sherman Act. We hold that it does.

It may be that the sale of "Go" occurs "in" interstate commerce—that the overall chain of events, from the shipment of dried milk and other ingredients into Arizona from other states to the ultimate sale of "Go" to retailers and consumers in Arizona, constitutes a single "flow of commerce" for jurisdictional purposes. *See, e. g.*, Cartrade, Inc. v. Ford Dealers Advertising Ass'n, 446 F.2d 289, 292 (9th Cir. 1971); Plymouth Dealers Ass'n v. United States, 279 F.2d

In deciding whether the requisite "substantial economic effect" is present, it is appropriate to consider whether the problem affects commerce in more than one state, so as to be beyond the practical power of a single state to regulate. *See* Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); Stern, *supra* note 13, at 304; Stern, The Commerce Clause and the National Economy: 1933–1946 (Pt. 2), 59 Harv.L.Rev. 883, 944–45 (1946).

15. *See also* Perez v. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686

(1971). As we said in United States v. Rodriquez-Camacho, 468 F.2d 1220 (9th Cir. Oct. 31, 1972), *quoting* Stafford v. Wallace, 258 U.S. 495, 521, 42 S.Ct. 397, 66 L.Ed. 735 (1922):

"This court will certainly not substitute its judgment for that of Congress in such a matter unless the relation of the subject to interstate commerce and its effect upon it are clearly nonexistent."

16. We do not decide the extent to which this question is for the judge or for the jury.

128, 135 (9th Cir. 1960); Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 740–41 (9th Cir. 1954).

Although "Go" is processed and sold entirely within the State of Arizona, the only locally derived ingredient is Arizona water. All of the remaining ingredients, including nonfat dried milk, originate out of state. Thus, for all practical purposes, the out-of-state ingredients *are* "Go." Although local water is the major ingredient of "Go" by volume and weight, in economic terms "Go" consists almost wholly of the ingredients that move in interstate commerce. The fact that those ingredients are not combined until they reach plaintiff's Arizona plant is not enough to interrupt the practical continuity of the movement. *See* Plymouth Dealers Ass'n v. United States, *supra,* 279 F.2d at 135; Las Vegas Merchant Plumbers Ass'n v. United States, *supra,* 210 F.2d at 740–741.

Even if "Go" is not actually "in commerce," however, the relationship between defendants' conduct in suppressing the sale of "Go" and a restraint upon interstate commerce in "Go"'s ingredients is, in a realistic business sense, close and substantial. If defendants are successful in preventing the sale of "Go" and other Arizona-made filled milk products in the State of Arizona, those products cannot be sold at all.[17] The quantitative effect on the overall interstate flow of dried milk and other ingredients is not alleged. But it is the nature of the effect that is important: to whatever extent, it is certain that the flow of "Go"'s ingredients into Arizona *will* be diminished by an anticompetitive restraint imposed on a product substantially composed of those ingredients. And the states in which those ingredients originate are powerless to protect their commerce against this diminution. Such an "effect" is "substantial" for the purpose of the commerce clause; it has a "real and

substantial relationship to the national interest" in a competitive economy as expressed in the Sherman Act.

Defendants argue, however, that (1) the fact that their conduct applied only to the sale of "Go" and not to the sale of its imported ingredients does make a difference; and (2) in any case, those ingredients "came to rest" in Arizona prior to sale as the end-product "Go." Given a determination that defendants' conduct "substantially affects" the interstate commerce in "Go"'s ingredients in a realistic business sense, neither of these mechanistic objections has merit.

■ It is certainly no bar to jurisdiction under the Sherman Act that defendants' conduct applied only to the sale of "Go" rather than directly to the sale of its ingredients. This is clear from Mandeville Island Farms, Inc. v. American Crystal Sugar Co., *supra,* 334 U.S. 219, 68 S.Ct. 996. An agreement among producers of sugar fixing the price paid to farmers for sugar beets grown in California was held to be within the Sherman Act even though the beets did not move in interstate commerce but were processed into sugar in California refineries before the sugar was shipped to other states. This result was held to follow from the economic fact that an agreement fixing the price paid for beets necessarily affected interstate commerce in sugar. To argue to the contrary, the Court said, "[very nearly] denies that the price of beets and restrictions upon it have any substantial relation in fact or in legal significance for the statute's purposes to the price of sugar sold interstate, when the restrictions take place within the confines of a single state and before the interstate marketing process begins." 334 U.S. at 228–229, 68 S.Ct. at 1002. It would equally ignore business reality to deny that exclusion of "Go" from the Arizona market has "any substantial relation in fact or in legal significance" to the interstate commerce in the dried milk and

---

17. As stated in the stipulation, "Plaintiff sells 'Go' exclusively within the State of Arizona, 'Go' being a filled milk banned from interstate commerce under 21 U.S.C. §§ 61, 62." *See* note 2.

other ingredients from which, by the addition of local water, "Go" is made. This is no less true because the processing occurred after the interstate shipment rather than before, as we explicitly held in Las Vegas Merchant Plumbers' Ass'n v. United States, *supra*, 210 F.2d at 741–742. *See* Plymouth Dealers Ass'n v. United States, *supra*, 279 F.2d at 135. *See also* Cartrade, Inc. v. Ford Dealers Advertising Ass'n, *supra*, 446 F.2d at 292.

■■■■ Nor is the Sherman Act inapplicable merely because the imported ingredients "come to rest" at plaintiff's Arizona plant prior to the point at which defendants' conduct had its initial impact. If the "come-to-rest" doctrine is applicable to Sherman Act cases at all,[18] it is relevant only to whether defendants' acts occurred "in" interstate commerce. In Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), the defendants argued that an agreement among Oklahoma liquor wholesalers to divide the Oklahoma market was not within the Sherman Act's jurisdictional reach because "the liquor 'came to rest' in the wholesalers' warehouses and . . . interstate commerce ceased at that point." *Id.* at 321, 88 S.Ct. at 444. "[W]hatever the validity of that conclusion," said the Court, "it does not end the matter. For it is well established that an activity which does not itself occur *in* interstate commerce comes within the scope of the Sherman Act if it substantially *affects* interstate commerce." *Id.* In the present case, plaintiff has alleged a sufficient relationship between defendants' alleged conduct and the interstate commerce in "Go"'s ingredients to justify a holding that that conduct "substantially affects" interstate commerce.

■■■■ We must therefore reject defendants' specific objections to Sherman Act jurisdiction. We recognize, however, that there must be some limit on the intrusiveness of Sherman Act regulation. Since every enterprise, however localized, inevitably has some effect, however remote, on the flow of commerce among the states, some "localness," "remoteness," or "de minimis" factor must intervene or federal regulation is boundless.

This is the underlying theme of Page v. Work, 290 F.2d 323 (9th Cir. 1961), and Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th Cir. 1969), relied upon by defendants. *Page* and *Sun Valley Disposal* involved local businesses using supplies drawn from the stream of interstate commerce. We recognized that interference with those businesses inevitably had some interstate effect.[19] We held, nonetheless, that this effect was "incidental," and did not justify federal regulation of competitive restraints imposed on businesses that were "wholly local in character." *See* Sun Valley Disposal Co. v. Silver State Disposal Co., *supra*, 420 F.2d at 343.

■■■■ There is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts. As the limits of Congress' power to regulate interstate commerce are approached, deciding the category in which

18. *See* Katzenbach v. McClung, 379 U.S. 294, 302, 85 S.Ct. 377, 383, 13 L.Ed.2d 290 (1964):
"[T]he cases holding that interstate commerce ends when goods come to rest in the State of destination [are not] apposite here [in analysis of the scope of the federal commerce power]. That line of cases has been applied with reference to state taxation or regulation but not in the field of federal regulation."

19. Although the effect in *Page* was at one point characterized as "nonexistent," 290 F.2d at 333, it was simultaneously characterized as "indirect," *id.* It is clear, therefore, that "nonexistent" was not used in its literal sense.

a particular case falls becomes a matter of degree.[20]

We think it is reasonably clear, however, that the justification for federal control of the anticompetitive activity in this case is stronger than in either *Page* or *Sun Valley Disposal Co.*

The anticompetitive conduct involved in *Page* was directed at controlling the sale of legal advertising in Los Angeles County, California. The sale, publication, and distribution of the legal advertising was confined to Los Angeles County. The interstate commerce relied upon was movement of newsprint, ink, and other supplies to a local newspaper deprived of such advertising. The court's conclusion that the restraint upon competition in the sale of legal advertising had only an "inconsequential, remote, or fortuitous" impact upon this line of interstate commerce, 290 F.2d at 332, is not inconsistent with our conclusion that the deliberate exclusion of "Go" from the market would have a substantial impact on interstate commerce in the only economically significant ingredients of that very product. There is a clear difference between the cases, albeit one of degree, in the justification for federal control of the particular anticompetitive activity as a means of protecting the particular line of interstate commerce.

This is also true of *Sun Valley Disposal Co.* The activity of the defendants in that case was directed at eliminating competition in the garbage pickup and disposal service in Clark County, Nevada. Some of the supplies used in furnishing these services, notably the garbage containers, moved in interstate commerce. "This fact alone," the court said, "does not turn what was really a

local activity into an interstate one." 420 F.2d at 343. The opinion discloses none of the underlying business facts upon which this conclusion rests, and it may well be that the supplies moving in interstate commerce were an economically insignificant part of the total service rendered. A barber's scissors and other supplies may move in interstate commerce, but "this fact alone" might not justify federal regulation of the price of a haircut, or give an antitrust claim to a barber forced out of business by a combination of other barbers in the community. In the present case, on the other hand, ingredients that move in interstate commerce represent the greater part of the value of "Go."

In essence, this case differs from *Sun Valley Disposal* in the same way it differs from *Page*. The basic issue in each of the three cases is the extent to which a prohibition of the defendants' specific conduct is justifiable as a means of protecting the specific line of interstate commerce involved. Approached on these terms, the relation between the restraint of competition in the distribution of the end-product "Go" and the flow of "Go"'s interstate ingredients is clearly more substantial than the relation between either *Page's* restraint of competition in legal advertising and the flow of its interstate ingredients or *Sun Valley Disposal's* restraint of competition in trash service and the flow of its interstate ingredients. The fact that the conduct to be prohibited is directed against the distribution of "Go" itself, and that all of "Go"'s economically significant ingredients derive from a line of interstate commerce, makes the prohibition of that conduct more clearly reasonable as a means of protecting the particular line of interstate commerce.[21]

20. Too often in this area, judicial discomfort with uncertainty, aggravated by the rapid expansion of traditional conceptions of federal commerce power, has led to a continued grasping for specific, easily applicable standards, standards which regularly had to be "reinterpreted" or discarded altogether in the face of changing economic realities. In the final analysis, the real-world business nature

of the Sherman Act's purpose and subject matter permits no easy solutions. As noted earlier, it is the duty of the courts to apply "a practical, case-by-case economic judgment" rather than to take refuge in "abstract or mechanistic formulae." *See* text at note 14 *supra*.

21. Uniform Oil Co. v. Phillips Petroleum Co., 400 F.2d 267 (9th Cir. 1968), is also

We conclude that a sufficient relationship appears from the complaint and stipulated facts between the restraint allegedly imposed by defendants and interstate commerce in "Go" and its ingredients to establish jurisdiction under the Sherman Act.

## V. *Commerce in Fluid Milk*

■ We next consider whether defendants' conduct falls within the jurisdictional reach of the Sherman Act because of the alleged relationship between that conduct and the second line of interstate commerce described in the complaint—the movement of fluid milk into Arizona from other states for processing, and, after processing, to points in Arizona and other states for sale. We hold that it does.

As we have noted, plaintiff alleges that fluid milk flows in interstate commerce into and out of Arizona. It is the premise of the complaint that "Go" and other filled milk products compete with fluid milk in the Arizona market. Plaintiff alleges that the purpose and effect of defendants' conduct was to exclude this competition, and thereby to restrain and monopolize the interstate commerce in fluid milk.

Prohibiting a conspiracy to exclude filled milk from the Arizona milk market is a "necessary and proper" means to the successful exercise of Congress' plenary power to regulate interstate commerce in fluid milk. Defendants' alleged conduct would have a significant, if unpredictable, impact upon interstate commerce in fluid milk: the overall supply of milk and milk substitutes in the Arizona market would be diminished; presumably, the price of fluid milk would rise; the quantity of Arizona-produced fluid milk available for export to other states would decrease, or the quantity of fluid milk brought into Arizona from other states would increase.[22]

The specific consequences may be speculative, but the reality of the economic impact is not. Plaintiff notes that the Secretary of Agriculture has included filled milk in the Milk Marketing Order for the Central Arizona Marketing Area, *see* 7 C.F.R. § 1131.18, and that this necessarily means that the Secretary has determined that filled milk is either in the current of interstate commerce, or "directly burdens, obstructs, or affects interstate commerce" in milk, 7 U.S.C. § 608c(1). *See* note 6 *supra*. Defendants concede that this is so, but argue that the Secretary's determination under the Agricultural Adjustment Act is somehow different from that the court must make under the Sherman Act. The condition imposed by the proviso in 7 U.S.C. § 608c(1) upon the Secretary's right to regulate, however, is the same condition that must be satisfied before conduct may be regulated by Congress under the commerce clause.

distinguishable. We note that defendants have not relied upon it. The restraint involved was "price fixing in the retail gasoline market in Helena, Montana." The impact upon interstate commerce relied upon was that plaintiff purchased an unspecified portion of its gasoline from a Montana refinery which, in turn, obtained its crude oil from Wyoming, and that an unspecified portion of plaintiff's sales involved credit cards of other companies and collection for such sales was obtained through an oil company located in Spokane, Washington. 400 F.2d at 269. Thus, the interstate commerce involved may have been de minimis. As the court held, "[A]ssuming that there was involvement with interstate commerce in the [plaintiff's] operation, there was nothing upon which the jury might have based an assessment of the substantiality of that involvement." *Id.* at 270. In the present case, on the other hand, all of the economically significant ingredients of "Go" move in interstate commerce.

In addition, of course, plaintiff in this case has alleged a restraint upon interstate commerce in fluid milk, including that distributed by defendants. *See* Part V.

22. *See* United States v. Wrightwood Dairy Co., 315 U.S. 110, 120–21, 62 S.Ct. 523, 86 L.Ed. 726 (1942); Parker, Monopoly in the Milk Industry, 3 Antitrust Law & Econ.Rev. (No. 4) 111, 120 (1970).

As noted earlier, the underlying standard remains constant whether applied by an administrative agency or a court. *Cf.* United States v. Darby, *supra,* 312 U.S. at 119–120, 61 S.Ct. 451. The Secretary's determination may not bind the court, but it at least adds substance to plaintiff's jurisdictional allegations. *See* Katzenbach v. McClung, *supra,* 379 U.S. at 299–301, 304, 85 S.Ct. 377, Heart of Atlanta Motel v. United States, *supra,* 379 U.S. at 252–253, 85 S.Ct. 348.

Congress' power to regulate defendants' conduct because of its impact upon interstate commerce in fluid milk does not depend in any way upon finding an interstate aspect in plaintiff's business of producing and selling "Go."

It makes no difference how "local" plaintiff's business may be in this sense —defendants' conduct would fall within the Sherman Act even if all ingredients of "Go" originated within Arizona. The Sherman Act applies because defendants' suppression of plaintiff's business substantially affects interstate commerce in fluid milk; nothing else is required. "[T]he marketing of a local product in competition with that of a like commodity moving interstate may so interfere with interstate commerce or its regulation as to afford a basis for Congressional regulation of the intrastate activity. It is the effect upon the interstate commerce or its regulation, regardless of the particular form which the competition may take, which is the test of federal power." United States v. Wrightwood Dairy Co., 315 U.S. 110, 120, 62 S.Ct. at 526 (1942).

We conclude that the complaint alleges a sufficient relationship between the restraint imposed upon commerce in "Go" and other filled milk, and interstate commerce in fluid milk, to satisfy the jurisdictional requirements of the Sherman Act, even assuming that the commerce in "Go" and other filled milk is wholly intrastate.

Reversed and remanded.