David DeVOTO and Charles F. Volk,
Plaintiffs-Appellants,

v.

PACIFIC FIDELITY LIFE INSUR-
ANCE CO. and Bankers Mortgage Co.
of California, Defendants-Appellees.

No. 73–1685.

United States Court of Appeals,
Ninth Circuit.

May 15, 1975.

Joseph M. Alioto (argued), San Francisco, Cal., for plaintiffs-appellants.

James R. Madison (argued), of Orrick, Herrington, Rowley & Sutcliffe, San Francisco, Cal., for defendants-appellees.

Before CHOY and GOODWIN, Circuit Judges, and BEEKS,* District Judge.

* The Honorable William T. Beeks, Senior United States District Judge for the Western District of Washington, sitting by designation.

## OPINION

BEEKS, District Judge:

Appellants appeal from an order of the district court granting summary judgment of dismissal. They allege a violation of Section 1 of the Sherman Act.[1] The court concluded that the acts complained of did not affect interstate commerce or manifest an anticompetitive purpose or effect.

Appellee Bankers Mortgage Company of California (hereinafter "Bankers") is in the business of making real estate loans in California and Nevada.[2] Appellee Pacific Fidelity Life Insurance Co. (hereinafter "Pacific") sells life, health and accident insurance throughout the United States. At all times relevant to this action both appellees were subsidiaries of the Transamerica Corporation.

One aspect of Pacific's business is the sale to mortgagors of mortgage protection insurance that guarantees payment of the mortgage in the event of the death or disability of the mortgagor. Bankers does not sell mortgage protection insurance, but in 1967 and 1968 it had an exclusive arrangement with Pacific whereby it supplied Pacific with a list of its mortgagors and cooperated in their direct mail solicitation. In exchange for these services, Bankers received commissions on mortgage protection policies sold by Pacific to Bankers' mortgagors.

During this period appellant DeVoto was conducting business under the name of Market Placement Agency. Market Placement provided special insurance programs to businesses throughout the Western United States. Appellant Volk was employed by it as a general agent. Late in 1967 Volk contacted Bankers and offered a new mortgage protection solicitation plan on behalf of American Home Assurance Company of New York (hereinafter "American"). The plan pro-

1. 15 U.S.C. § 1.

2. In 1968 Bankers was the eighth largest mortgage banker in the United States (R. 322).

vided for the payment of $1.25 for each mortgagor's name supplied by Bankers, in addition to commissions on policies sold. Bankers accepted the plan and elected to sign a two-year contract with American and to cease dealing on an exclusive basis with Pacific. Appellants were to receive commissions on insurance policies sold by American to Bankers' mortgagors.

American has its principal place of business in New York, and the contract contemplated that Bankers' mortgagors in California and Nevada would be serviced by American from its East Coast offices. Whereas Pacific offered life, health and accident insurance in the mortgage protection field, American offered only health and accident insurance. Under the post-1968 arrangement, therefore, Bankers' customers would potentially be receiving solicitation from both Pacific and American.

Disconcerted over the loss of its exclusive arrangement with Bankers, Pacific sought to match the American package and to persuade Bankers to reinstate the exclusive relationship. It met American's offer of $1.25 per name supplied, but there is some question as to whether Bankers would realize an equal amount in commissions with Pacific since the alleged facts suggest that, on the basis of past records, American enjoyed considerably better market penetration than did Pacific. That is, for a given number of names supplied by Bankers, American could expect to sell more insurance policies, and thereby generate more commissions, than could Pacific.

In any event, Pacific persuaded Bankers to abrogate its contract with American, and to return to its exclusive arrangement with Pacific. Pacific agreed to hold Bankers harmless against any liability arising out of Bankers' abrogation of the agreement with American. Appellees assert that the decision to abrogate the American contract was reached on the basis of pure business considerations. Appellants claim that the decision was made in consideration of the corporate relationship between Bankers and Pacific, and in response to pressure to keep the business of mortgage protection insurance within the Transamerica "family."

Appellants brought this action under the jurisdictional grant of Section 4 of the Clayton Act,[3] alleging that the action of Bankers and Pacific manifests a combination in restraint of trade in violation of Section 1 of the Sherman Act. Appellees subsequently moved for summary judgment on the grounds that (1) the activities complained of occurred within the business of insurance, and thus are exempted from the antitrust laws by virtue of the McCarran-Ferguson Act,[4] (2) appellants lack standing to sue, (3) the acts complained of were not in, nor did they affect interstate commerce, nor did they (4) manifest an anticompetitive purpose or effect.

The district court ruled in favor of appellants on the first two issues, finding that the acts complained of were peripheral to the "business of insurance" and thus without the protective scope of McCarran-Ferguson; and that appellants were within the target area of the alleged antitrust violation and thus have standing to sue. These rulings are affirmed for the reasons stated by the district court.[5]

Summary judgment was granted on the basis of the two remaining issues: the court ruled that the acts complained of neither occurred in nor affected interstate commerce, and that they did not manifest an anticompetitive purpose or effect. We disagree.

---

**3.** 15 U.S.C. § 15.

**4.** 15 U.S.C. § 1011 *et seq.*

**5.** The district court found the standing issue to be controlled by Mulvey v. Samuel Goldwyn

Productions, 433 F.2d 1073 (9th Cir. 1970), cert. denied, 402 U.S. 923, 91 S.Ct. 1377, 28 L.Ed.2d 662 (1971), and the McCarran-Ferguson issue by Securities and Exchange Commission v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1968). We agree.

## I.

■ Jurisdiction under Section 1 of the Sherman Act exists only if the acts ·complained of occur within the flow of, or substantially affect interstate commerce.[6] Moreover, "the test of jurisdiction is not that the acts complained of affect a business engaged in interstate commerce, but that the conduct complained of affects the interstate commerce of such business."[7]

Appellees place much reliance on the fact that Bankers, Pacific and appellants are all residents of California, that the communications leading to the alleged combination all occurred within California, and that the mortgagors purchasing insurance under the contracts at issue are all residents of California.[8] Appellees argue that these substantial intrastate connections preclude a finding that the alleged combination occurred within the flow of or affected interstate commerce.

We do not reach the issue of whether the alleged violations occurred in interstate commerce. Our conclusion, set forth below, that the acts complained of substantially affect interstate commerce is sufficient to uphold jurisdiction under the Sherman Act and require setting aside the contrary ruling of the district court.

The court below found itself to be without jurisdiction on the basis of its finding that the insurance solicitation program ultimately submitted by Pacific was essentially the same as that offered by American, and that there was no evidence that substitution of Pacific for American would have any impact on the number of policies sold to Bankers' mortgagors. The court consequently found our holding in Cartrade, Inc. v. Ford Dealers Advertising Association, of Southern California,[9] to require the conclusion that the alleged combination did not affect interstate commerce. The district court's reliance on Cartrade is misplaced.

The plaintiff in Cartrade was a company that arranged trades of Ford automobiles among members of the Ford Dealers Advertising Association of Southern California. When a customer desired a model that a particular dealer did not have in stock, the dealer would contact Cartrade who, for a fee, would consult its computer listings of all cars held in stock by member dealers and would advise the inquiring dealer of any other member dealers having in stock the requested model. The dealers could then exchange automobiles to their mutual benefit. The procedure assisted dealers to serve customers who desired a specific model and did not wish to wait while such a car was ordered and delivered from an out-of-state assembly plant. Cartrade enjoyed an exclusive relationship with member Ford dealers and was provided by Ford with the necessary computerized inventory listings.

This relationship was terminated by the Dealers Association, and Ford thereafter declined to supply Cartrade with the computer listings. Cartrade was thereby forced out of business, and it subsequently filed suit under Sections 1 and 2 of the Sherman Act.[10] This court upheld dismissal of the suit because, inter alia, the alleged activities did not affect interstate commerce. It was reasoned

---

6. Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954).

7. Page v. Work, 290 F.2d 323, 330 (9th Cir.), cert. denied, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961).

8. It appears, however, that appellees' assertion that all of Bankers' mortgagors are located in California is not supported by the record. The evidence suggests that 93.4% of Bankers'

mortgagors are located in California and that the remainder are located in Nevada. Determination of this factual issue is not essential to our decision on this appeal. On remand, however, the district court should reconsider its finding that Bankers' mortgagors are exclusively Californians.

9. 446 F.2d 289 (9th Cir. 1971), cert. denied, 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972).

10. 15 U.S.C. §§ 1, 2.

that the removal of Cartrade and the substitution of its successor might better serve the business interests of the dealers. Cartrade could not show that the substitution would hurt Ford auto sales or result in the importation of fewer Ford cars into California. Cartrade's business itself was purely local, and interstate commerce in Ford cars could not be shown to be affected by the substitution of a successor car trader for Cartrade.

Cartrade is thus distinguishable from the present case in one critical respect: whereas in Cartrade the termination of local business relations did not affect the flow of interstate commerce, in the instant case the combination between Bankers and Pacific worked effectively to foreclose American from a significant segment of the California market for mortgage protection insurance. It essentially terminated the interstate flow of mortgagor lists, insurance policies, premiums and information with respect to Bankers' mortgagors.

Interstate insurance transactions fall within the definition of interstate commerce as that term is applied pursuant to federal antitrust regulation,[11] and "[i]f it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze."[12]

## II.

The district court held that the alleged acts of appellees did not manifest an anticompetitive purpose or effect, and, as a matter of law, were beyond the purview of Section 1 of the Sherman Act. The court found that Bankers abrogated its contract with American and resumed its exclusive relationship with

Pacific "for business reasons," and "for reasons of their own which are not relevant here."

Viewing the evidence as a whole and the inferences which may be drawn therefrom in the light most favorable to appellants, as we must,[13] the record clearly supports the contentions that (1) the American package was superior to that finally offered by Pacific, and (2) Bankers based its decision to abrogate the American contract and to resume its exclusive relationship with Pacific upon its desire to keep the business of mortgage protection insurance within the Transamerica corporate group. So viewed, the record reveals possible anticompetitive conduct which may fall within the proscriptive sweep of Section 1 of the Sherman Act.

In FTC v. Consolidated Foods Corp.,[14] the FTC invoked Section 7 of the Clayton Act[15] to challenge Consolidated's acquisition of Gentry, Inc. Consolidated was a large manufacturer of processed foods, and Gentry was a manufacturer of dehydrated onion and garlic. Consolidated purchased numerous food products from suppliers who were, in turn, purchasers of dehydrated onion and garlic. The Supreme Court upheld the finding of the Commission that the effect of the acquisition "may be substantially to lessen competition."[16] In practical terms, Consolidated would be able to exert the considerable leverage manifest in its purchasing power to coerce its suppliers to buy from Gentry, the Consolidated subsidiary. The Court observed that

". . . the 'reciprocity' made possible by such an acquisition is one of the congeries of anticompetitive practices at which the antitrust laws are aimed. The practice results in 'an irrelevant

---

11. See, United States. v. South-Eastern Underwriters Assoc., 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). Certain exemptions not relevant here are legislated in the McCarran-Ferguson Act, 15 U.S.C. § 1011 et seq.

12. United States v. Women's Sportswear Mfg. Ass'n, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).

13. Consolidated Electric Co. v. United States, 355 F.2d 437 (9th Cir. 1966).

14. 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

15. 15 U.S.C. § 18.

16. 380 U.S. at 593, 85 S.Ct. at 1221.

and alien factor,' . . . intruding into the choice among competing products, creating at the least 'a priority on the business at equal prices.' " [17]

Likewise, in International Salt Co. v. United States,[18] a reciprocal arrangement under which International leased certain of its patented machines on the condition that the lessees would use therein only International's products, was found to violate the Sherman Act even though International agreed to meet the prices offered by competing suppliers. Again, the Court noted the anticompetitive effect of an agreement that gave the defendant a priority on the business at equal prices.[19]

If, as alleged, Pacific was able, because of its corporate relationship with Bankers, to induce Bankers to abrogate the American contract without having to offer Bankers a package of equal value, then Pacific's position of ascendency exceeds even the priority at equal prices held to be anticompetitive in *International Salt.* This relationship is a factor over which an outsider such as American has no control, and with which it cannot hope to compete. It is a factor unrelated to traditional competitive elements such as product price, quality and marketability. It is an "irrelevant and alien factor" that, when allowed to intrude into the free marketplace, may produce an anticompetitive effect such as the antitrust laws were designed to combat.[20]

Appellees urge that our holding in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.[21] is to the contrary. In that case a liquor distributor that enjoyed an exclusive contract to distribute the products of the defendant distillers was terminated, and the distribution rights were contracted to another. Several of the defendant distillers were members of the multicorporation "Seagram group." It was alleged by the plaintiff therein that defendants conspired to take his business away from him in violation of Section 1 of the Sherman Act. This court disagreed, holding that absent anticompetitive intent, termination of a distributor is a proper business option. We held that the alleged conspiracy, the negotiations between the several distillers and the new distributor, was designed merely to ascertain and insure that the proposed distribution system would be viable. We concluded that there was no unreasonable restraint of trade.

The *Seagram* case may, however, be distinguished from the case before us. In *Seagram* there was no breach of contract. An existing contract was simply allowed to expire. This is relevant to our determination in *Seagram* that traditional competitive factors led to the termination: there was no evidence suggesting that any factors other than traditional business considerations were weighed pursuant to reaching the decision to change distributors. Neither plaintiff therein nor the defendant distributor was a member of the Seagram corporate family. There was thus no suggestion that the termination was effected for the purpose of keeping the distribution business within the Seagram group. In *Seagram* we did not consider that issue.

■ The view of the evidence most favorable to appellants here suggests that Pacific had achieved a priority on Bankers' business as a result of its corporate affiliation with Bankers. An issue of fact is presented as to whether in breach of the American contract, the defendants intended to, or did, unreasonably restrain trade in violation of § 1 of

---

17. 380 U.S. at 594, 85 S.Ct. at 1221.

18. 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

19. *See also,* Northern Pac. Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

20. FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965).

21. 416 F.2d 71 (9th Cir. 1969), cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. denied, 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415 (1970).

the Sherman Act. *See* United States v. Columbia Steel Co., 334 U.S. 495, 522, 527, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). In light of the existence of this factual issue, summary dismissal was improvidently granted.

Reversed, and remanded for further proceedings in accordance herewith.