**Dick Alexander WORKMAN, d/b/a Workman Motors, et al., Plaintiffs,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, et al., Defendants.**

**No. C–75–1799 RFP.**

United States District Court, N. D. California.

July 16, 1981.

Frederick P. Furth, Joel Yodowitz, Furth, Fahrner, Bluemle, Mason & Wong, Robert W. Mills, Law Offices of Robert W. Mills, San Francisco, Cal., for plaintiff Dick Alexander Workman.

M. Laurence Popofsky, Leonard J. Martiniak, Robert A. Rosenfeld, Kirk G. Werner, Pamela A. Mull, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant State Farm Auto. Ins. Co.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

On May 6, 1981, defendants in this antitrust action moved for summary judgment. After hearing argument on the motion and having taken the matter under submission, this court hereby grants the motion on behalf of all defendants.

## INTRODUCTION

Plaintiffs, the owner-operators of four San Francisco automobile body repair shops, are seeking damages from ten automobile insurance companies for alleged violations of federal and California antitrust laws. The complaint, filed on August 27, 1975, alleges that defendants engaged in a conspiracy to fix the price of autobody repairs in San Francisco, to boycott plaintiffs' business, and to monopolize the autobody repair industry in violation of Sections 1 and 2 of the Sherman Act and the corresponding sections of the California Cartwright Act.

On September 19, 1976, this court granted summary judgment on behalf of all defendants. The judgment was rendered on two grounds: (1) that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–14, exempted defendants' alleged activities from review under the antitrust laws; and (2) that defendants' activities did not affect interstate commerce. Plaintiffs appealed the decision. The Ninth Circuit Court of Appeals, on May 18, 1979, entered an order remanding the case. 601 F.2d 605. The Court of Appeals was of the opinion that two Supreme Court decisions decided after this Court had granted summary judgment involved inter-

pretations of the McCarran-Ferguson Act which might bear on the issues involved in this case. These two cases are *St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) and *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). The Ninth Circuit expressed no opinion on the interstate commerce issue.

After years of extensive discovery, plaintiffs' principal contention remains the same: the defendant insurance companies have engaged in a horizontal conspiracy to fix the price of autobody repairs in the San Francisco area. In support of this contention, they offer some evidence of communication between the defendants, but rely primarily upon the parallel business practices of the insurance companies, such as the use of provider agreements with preferred shops, drive-in claim centers and two-party settlement checks, the establishment of hourly labor rates, and common association memberships. Admittedly, plaintiffs possess no direct evidence of any agreements among the defendants in this action. Further plaintiffs argue that horizontal agreements which fix the price of autobody repairs are not within the business of insurance exception of the McCarran-Ferguson Act.

Even if the Act exempts the horizontal agreement to pay a "prevailing labor rate," plaintiffs contend that the use of provider agreements to implement this rate is unlawful. Plaintiffs cite the *Quality Auto Body* case, 1980–2 Trade Cases ¶ 63,507 at 76,691 (N.D.Ill.1980), for this proposition. Plaintiffs do not argue that the agreements, standing alone, are unlawful.

Lastly, plaintiffs contend that defendants have combined and conspired among themselves and with their insureds to boycott plaintiffs' businesses and that they have conspired with the "preferred" or "captive" shops to fix the price of autobody repairs.

Defendants have renewed their motion for summary judgment. In essence, they attempt to controvert each theory upon which plaintiffs rely to support their claim

that the conduct of the defendants violates the antitrust laws. Thus, defendants argue that: (1) their activities do not "affect" interstate commerce; (2) they have not conspired to fix prices; (3) any agreement to fix prices is exempt from antitrust scrutiny by virtue of the McCarran-Ferguson Act, *Royal Drug* notwithstanding; (4) defendants have not entered into provider agreements with "captive" autobody shops; (5) any provider agreements are legal under the antitrust laws; and (6) defendants have not boycotted plaintiffs' shops. Analysis of these varying contentions depends upon a close examination of the factual background which prompted the present action.

## STATEMENT OF THE FACTS

Plaintiffs complain that the procedures utilized by defendants to resolve claims by their insureds results in the siphoning of business *away* from their repair shops *in favor of* "captive" or "preferred" shops which will perform autobody repairs for a lesser hourly rate than that charged by plaintiffs. Although the claims-handling procedures of each defendant vary somewhat, they follow the same general pattern. Fairly typical is State Farm. When a policyholder reports a damaged automobile to State Farm, State Farm requests him/her to bring the damaged vehicle (if drivable) to a claim center for an in-house appraisal.[1] An adjuster will then prepare an estimate. After receiving the estimate the car owner takes the damaged vehicle to a shop of his or her choice.[2] If the shop's estimate exceeds State Farm's, State Farm is willing to negotiate with the shop in an effort to

arrive at a price agreeable to both.[3] Should no agreement be reached, the policyholder is free to have his car repaired at that shop but will receive only the amount reflected in the State Farm estimate. The car owner must thereafter pay the difference to the shop.

In those cases where the policyholder has no preference and requests information concerning repair facilities, State Farm personnel refer to a "garage directory" to identify three repair shops in a location convenient to the owner which will perform competent repairs at State Farm's estimated prices.[4] State Farm makes clear to its insureds that State Farm does not guarantee the work performed by these shops. State Farm compiles its garage directory and computes the "prevailing competitive" labor rate on the basis of survey forms completed by automobile body repair shops.[5] The form is prepared by State Farm and requests information concerning the shop's facilities, its hourly labor rate, etc. According to State Farm, this information is not shared with any other insurance company. On the basis of these or similar practices, plaintiffs complain of antitrust violations.

## ANALYSIS

Before reaching the merits of plaintiffs' allegations, we will re-examine one ground upon which this court originally granted summary judgment—that the challenged activities do not substantially affect interstate commerce. Resolution of this issue in defendants' favor would, of course, dispose

---

1. Defendants Aetna and California Casualty did not use drive-in claim centers during 1971–75, the period of time covered by this lawsuit.

2. This practice was apparently engaged in by all defendants to this action.

3. Defendant Liberty Mutual has a policy of not negotiating with shops. Moreover, the declaration testimony of plaintiffs Chavez and Hebert revealed that the defendants who did negotiate did so with varying degrees of flexibility.

4. The affidavits submitted by defendants CSAA and Travelers reveal that they do not maintain a list of shops.

5. The affidavits submitted by the parties revealed that GEICO and Aetna did not develop surveys but instead prepare estimates solely on the basis of the adjuster's knowledge of the market. Moreover, the evidence disclosed the defendants CSAA, California Casualty, Aetna and Travelers generally wrote estimates at the repairing shop's rates. CSAA, for example, apparently often estimated only the hours required to perform a particular repair and let the shop fill in its hourly rate.

of this action without necessitating further inquiry into the substance of plaintiffs' claims.

## I. *Interstate Commerce*

■ Section 1 of the Sherman Act, 15 U.S.C. § 1, states in pertinent part:

Every contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce among the several States,* or with foreign nations, is declared to be illegal. . . .

(emphasis added.) Thus, jurisdiction under the Sherman Act may not be invoked unless the relevant aspect of interstate commerce is identified. As the Supreme Court stated recently:

[I]t is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce.

*McClain v. Real Estate Bd. of New Orleans,* 444 U.S. 232, 242, 100 S.Ct. 502, 509, 62 L.Ed.2d 441 (1980).

In our opinion of September 16, 1976, we stated:

The activities of which plaintiffs complain do not substantially affect interstate commerce and for that additional reason the federal antitrust laws cannot be invoked. *Cartrade, Inc. v. Ford Dealers Advertising Assoc. of So. Cal.,* 446 F.2d 289 (9th Cir. 1971), *cert. denied,* 405 U.S. 997, 92 S.Ct. 1249, 31 L.Ed.2d 465 (1972)

The Court of Appeals opinion was equally terse. While remanding this action in light of the intervening Supreme Court decision in *Royal Drug,* the Ninth Circuit dealt with the interstate commerce issue as follows:

The remaining issue, relating to the effect of the conduct alleged upon interstate commerce, need not be decided by us at this time, and the district court is invited to express any further views it may have upon compliance with the remand.

We therefore analyze this issue anew.

Defendants rely heavily on the reasoning of *Cartrade, Inc., supra,* and other Ninth

Circuit cases which hold that, in antitrust cases, "jurisdiction is proper only where *the acts complained of* occur within the flow of, or substantially affect, interstate commerce." *Uniform Oil Co. v. Phillips Petroleum Co.,* 400 F.2d 267, 269 (9th Cir. 1968) (emphasis added); *DeVoto v. Pacific Fidelity Life Insurance Co.,* 516 F.2d 1, 4 (9th Cir. 1975), *cert. denied,* 423 U.S. 894, 96 S.Ct. 194, 46 L.Ed.2d 126 (1975). Defendants thus argue that the only impact of the alleged antitrust violations here is either to shift between San Francisco repair shops the repair work, which does not affect interstate commerce, *or* to change the level of reimbursement to insureds or claimants, which does not affect the number of repairs performed, the prices paid to plaintiffs, the sources of plaintiffs' parts, or the volume of out-of-state parts which plaintiffs must order. Defendants therefore conclude that the acts complained of do not substantially affect interstate commerce.

The reasoning of the cases upon which defendants rely, and upon which we relied in our order of September 1976, has been largely discredited by intervening United States Supreme Court and Ninth Circuit cases. In *McClain v. Real Estate Bd. of New Orleans,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980), real estate purchasers brought suit against real estate brokers in the New Orleans area, claiming that the brokers had fixed their commissions in violation of the Sherman Act. The district court granted defendants' motion to dismiss for lack of subject matter jurisdiction and the Fifth Circuit affirmed. The Supreme Court reversed, holding that:

To establish the jurisdictional element of a Sherman Act violation it would be sufficient for petitioners to demonstrate a substantial effect on interstate commerce generated by respondents' brokerage activity. *Petitioners need not make the more particularized showing of an effect on interstate commerce caused by the alleged conspiracy to fix commission rates, or by those other aspects of respondents' activity that are alleged to be unlawful.*

444 U.S. at 242–243, 100 S.Ct. at 509–510 (emphasis added.)

In response to this decision, the Ninth Circuit squarely held that plaintiffs are no longer required to show that the defendant's alleged violative conduct substantially impacts upon interstate commerce. In *Western Waste Service v. Universal Waste Control*, 616 F.2d 1094 (9th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 205, 66. L.Ed.2d 88 (1980), the court stated:

> To establish Sherman Act jurisdiction, the district court required Western Waste to show that Universal's alleged antitrust violations had a substantial effect on interstate commerce. This test, however, was rejected by the Supreme Court this Term in *McClain v. Real Estate Bd.* . . . .

616 F.2d at 1096 (citation omitted).

■ It would seem, therefore, that *McClain* disposes of the interstate commerce issue in the plaintiffs' favor. Once the inquiry is shifted to an examination of the interstate nature of the *defendants' activities*, it is clear that subject matter jurisdiction is satisfied here. Not only are defendants' activities of the sort that may impact on interstate institutions, the defendants themselves *are*, for the most part, interstate institutions with nationwide activities. All defendants except California

Casualty[6] and CSAA are incorporated and have their principal places of business outside California.

Moreover, the Court in *McClain* and the Ninth Circuit in *Western Waste Service* strongly disfavor granting summary judgment on the grounds of interstate commerce unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 616 F.2d at 1095, n.1. In fact, the Ninth Circuit indicated that the district court should not make the determination pretrial:

> Universal's argument that the district court had authority to inquire into and determine the facts relating to the Sherman Act jurisdiction at this stage of the proceedings was expressly rejected by the Supreme Court this term in *McClain v. Real Estate Bd.* . . .

616 F.2d at 1095, n.1. On the basis of the foregoing discussion, we find that plaintiffs must prevail on the jurisdictional issue of interstate commerce.

## II. *The Existence of a Horizontal Conspiracy to Fix Prices*[7]

Plaintiffs argue that the provider agreements, as a means of implementing a horizontal conspiracy to fix prices, violate the

---

**6.** California Casualty, however, submitted no evidence from which this court could conclude, beyond a doubt, that it has no substantial impact upon interstate commerce. Thus, even though California Casualty appears to be a California corporation, we decline to grant summary judgment on the jurisdictional issue.

**7.** Also potentially dispositive of this lawsuit before reaching the actual substance of plaintiffs' claims is the "business of insurance" exception of the McCarran-Ferguson Act. The relevant portion of that act reads:

> [A]fter June 30, 1948, . . . the Sherman Act, and . . . the Clayton Act, and . . . the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is *not* regulated by State law. (emphasis added).

Further, section 1013(b) provides that "[n]othing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion or intimidation."

In the September 1976 Order, we held that all criteria had been met and that the challenged activities were therefore exempt from antitrust scrutiny. We stated:

> We find that the activities of which plaintiffs complain are the business of insurance and are regulated by state law and thus are exempt from the federal antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1014 (string cite omitted). Furthermore, defendants' alleged practices do not fall within the McCarran Act exception, § 1013(b), regarding boycotting, coercion, or intimidation. This exception has been consistently construed narrowly so as not to encompass defendants' alleged activities. (string cites omitted.)

It was this portion of the opinion which the Ninth Circuit addressed when it remanded the case in light of two intervening Supreme Court decisions. The Ninth Circuit believed that *Royal Drug, supra*, and *St. Paul Fire and Marine Ins. Co., supra*, appeared "to have a direct impact upon important issues in this case relating to whether agreements between an insurer and a service provider come within the 'business of insurance' under the McCarran-Ferguson Act. 15 U.S.C. §§ 1011–1014."

antitrust laws.[8] In *Quality Auto Body, supra,* the court reasoned:

[T]hat the plaintiff's burden of proving that the provider agreements unlawfully restrain trade would be satisfied if it could be shown that there exists a conspiracy between the defendants to fix prices, or a conspiracy to boycott plaintiff's business, and if the provider agreements are a means of implementing either of those conspiracies.

¶ 63,507 at 7696

▮ We first note, as did the court in *Quality,* that such a position is somewhat

In *Royal Drug,* the narrow issue before the Supreme Court was whether the provider agreements between a single insurance company, Blue Shield, and certain pharmacies constituted the business of insurance. In concluding that Pharmacy provider agreements were not the business of insurance, the court reasoned that the primary elements of insurance contracts are the spreading and underwriting of the policyholder's risk. "The Pharmacy agreements," the Court stated, "do not involve any underwriting of risk, but are merely arrangements for the purchase of goods and services." 440 U.S. at 214, 99 S.Ct. at 1075.

Another line of reasoning in *Royal Drug* stemmed from the legislative intent underlying the McCarran-Ferguson Act. After examining numerous statements of legislators, the Court found the primary concern of both representatives of the insurance industry and Congress to be "that *cooperative* ratemaking efforts be exempt from antitrust laws." 440 U.S. at 221, 99 S.Ct. at 1078 (emphasis added.) In defining the legislative intent, the Court relied heavily on a report of the National Association of Insurance Commissions. This report concluded:

For these and other reasons this subcommittee believes it would be a mistake to permit or require the unrestricted competition contemplated by the antitrust laws to apply to the insurance business. *To prohibit combined efforts for statistical and rate-making purposes would be a backward step in the development of a progressive business....* Congress itself recently recognized the *necessity for concert of action in the collection of statistical data and rate making....*

N.A.I.C. report, quoted at 440 U.S. 221–22, 99 S.Ct. at 1078 (emphasis in Supreme Court opinion.)

Thus, the Court held that the *inter-industry* Pharmacy Agreements, which in no way constituted rate-making agreements, were not intended by Congress to bask in the McCarran-Ferguson Act exemption. And, indeed, it appears to be this crucial distinction—between intra-industry cooperative efforts on one hand and inter-industry agreements on the other—that has led the two district courts that have considered the issue since *Royal Drug* to conclude that such horizontal agreements are exempt. In *Quality Auto Body,* for example, the court reasoned:

The Supreme Court [in *Royal Drug*] noted that a primary concern of Congress in passing this legislation "was that cooperative

ratemaking efforts be exempt from the antitrust law." 440 U.S. at 221, 99 S.Ct. at 1078. Thus, at least some agreements that would otherwise be condemned as price fixing were intended to be immune when engaged in by insurance companies. Agreements concerning the level of benefits would appear to fall into the same category as agreements setting rates.

1980–2 Trade Cases ¶ 63,507 at p. 76,696–97, n.4. *See also Proctor v. State Farm Mutual Automobile Ins. Co.,* 1980–2 Trade Cases ¶ 63,-591 at 77,138 (D.D.C.1980) (concluding that the United States Supreme Court's remand of the case in light of *Royal Drug* did not disturb the "core" ruling of the Circuit Court that the alleged horizontal agreements were exempt under the provisions of the McCarran-Ferguson Act.)

Such reasoning is sound. As the Supreme Court stressed in *Royal Drug,* Congress, in enacting McCarran-Ferguson, recognized the necessity for concerted rate-making efforts if insurance companies were to underwrite risks in a meaningful and responsible manner. The formula for the payment of insurance claims directly bears on rate making, since it determines how much risk is involved and how much risk will be assumed by the insurer. Thus, functionally, the intra-industry agreements here, which are inextricably intertwined with the premium to be charged, so closely resemble actual rate-making agreements that identical treatment under the McCarran-Ferguson Act is called for.

This court therefore joins in the conclusions reached by the courts in *Quality Auto Body* and *Proctor II* that horizontal agreements among insurance companies setting the level of benefits to be paid under insurance contracts fall within the protective ambit of the McCarran-Ferguson Act.

8. As stated above, plaintiffs do not contend that the provider agreements, standing alone, violate the Sherman Act. This was the principal contention addressed by this court in *Sausalito Pharmacy v. Blue Shield,* C–78–2196 RFP (March 16, 1980), in which we concluded that the express provider agreements between the insurance companies and the pharmacies did not, as a matter of law, violate the antitrust laws.

anomalous in light of the concomitant holding that the horizontal agreement itself is exempt from antitrust scrutiny. The court in *Quality Auto Body* believed, however, that this anomaly was an inevitable result of the holding in *Royal Drug*. We do not reach a decision on whether the use of provider agreements, as a means of implementing an exempted horizontal conspiracy, violates the antitrust laws, since we conclude that plaintiffs have demonstrated no triable issue of fact regarding the existence of a horizontal conspiracy to fix the price of autobody repairs in the San Francisco area. For the same reason, we need not decide whether plaintiffs have raised a triable issue of fact on the question of the existence of provider agreements. We will, for the purposes of this motion, assume the existence of such provider agreements.[9]

### A. *Evidence of a Horizontal Conspiracy*

In essence, plaintiffs allege that defendants have agreed among themselves to utilize a common formula for the payment of autobody repairs, and have effectuated this agreement through the use of "captive" or "preferred" shops—that is, those shops that have agreed with individual defendants to perform repairs at the prices fixed by defendants.

Admittedly, plaintiffs have no direct evidence of an agreement to fix prices. Instead, they rely chiefly upon the doctrine of conscious parallelism and circumstantial evidence. Case law demonstrates that conspiracies may be proven by circumstantial evidence alone. In an early Supreme Court case, the court stated that "it is elementary ... that conspiracies are seldom capable of proof by direct testimony and may be inferred from the things actually done...." *Eastern States Retail Lumber Dealers' Association v. United States*, 234 U.S. 600, 612, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914). In *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965) the Ninth Circuit stated:

While particularly true of price-fixing conspiracies, it is well recognized law that any conspiracy can ordinarily only be proved by inferences drawn from relevant and competent circumstantial evidence, including the conduct of the defendants charged.... As in so many other instances, it remains a question for the trier of fact to consider and determine what inference appeals to it as most logical and persuasive after it has heard all the evidence....

Several cases stand for the proposition that parallel conduct alone will not support an inference of concerted action. Only where the pattern of action undertaken is not consistent with the self-interest of the individual actors, were they acting alone, may an agreement be inferred solely from such parallel action. *Admiral Theatre Corp. v. Douglas Theatre Co.*, 585 F.2d 877 (8th Cir. 1978); *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 279–80, 88 S.Ct. 1575, 1587–88, 20 L.Ed.2d 569 (1968). In developing this doctrine, the Ninth Circuit has articulated the following standard:

Like businesses are generally conducted alike and, as the trial judge correctly stated, similarity in operations lacks probative significance unless present "under circumstances which logically suggest joint agreement, as distinguished from individual action."

*Independent Iron Works, Inc. v. U.S. Steel Corp.*, 322 F.2d 656, 661 (9th Cir. 1963), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

After reviewing all the evidence which plaintiffs submit in their behalf, we will conclude that, even under the liberal standard applicable in antitrust actions, plaintiffs have not met their burden of demonstrating a material issue of fact sufficient to defeat a motion for summary judgment against them.

---

**9.** We do note, however, that, at least for several defendants even an extremely formal arrangement seems to be lacking. Because we find no antitrust violation, however, for purposes of this motion, we will follow the tack taken by the court in *Quality Auto Body, supra*, and assume that such informal agreement do exist. It is undisputed, however, that there are no express or formalized arrangement as in *Royal Drug*.

### 1. *Communication between Defendants*

In· their first of two categories of evidence which plaintiffs contend raise a triable issue of fact, plaintiffs offer evidence of a few isolated instances of communication between some defendants in this action. As we will discuss, plaintiffs possess no evidence of any conversation remotely related to a formula for autobody repair reimbursement. In short, the items of evidence offered by plaintiffs are not the stuff from which inferences of antitrust conspiracies arise.

### a. *State Farm Memoranda*

The first communication cited by plaintiffs is an internal memorandum from State Farm's General Claim Superintendent to its Divisional Claim Superintendent stating that "during subrogation efforts other carriers learn that we are paying a lower rate than they are and complain to their shops about it." If anything, such a statement implies the absence of an agreement, not the presence of one.

The second State Farm memorandum cited by plaintiffs as significant discusses the peculiar conduct of a body shop owner in taking assignment of claims from insureds with damaged vehicles against the insurance company of the negligent driver. His conduct included renting cars to the insureds at high rates and then attempting to demand payment from the adverse insurance company. The final paragraph states: "Mr. Enos Devine, of our Company, has been in touch with Jerry Shepher of the San Francisco office of Travelers, who had files similar to ours." Again, this kind of communication between businesses regarding the potentially fraudulent conduct of an autobody shop owner simply does not support an inference of a conspiracy to fix prices.

### b. *Travelers' Memorandum*

The third communication is a Travelers interoffice memorandum in which Mr. Novelle stated that he had discussed rates for refinishing, paint and material prices with Allstate and State Farm. He stated that he "wanted other carriers' view other than what I hear from our people alone. I also spoke to Supvr. Belshaw of State Farm Insurance Co. It appears most carriers are paying $5.00 per refinishing hour for materials. It is my opinion this is high at 8.0 hours or above." Moreover, he stated, "he let me look at the old schedule and it was not quite what I am looking for."

This exhibit lacks probative value for several reasons. First and most importantly, it reveals no discussion whatsoever relating to an hourly labor rate or a formula for devising such a rate. Mr. Novelle's inquiry related solely to the price per hour for refinishing materials. Plaintiffs have not even attempted to show that the hourly labor rate State Farm would pay could be determined from the price they paid for refinishing materials. Significantly, Mr. Novelle testified in his deposition that the subject of the hourly rate was never touched upon.

Moreover, that Mr. Moock of Allstate showed Mr. Novelle an out-dated paint schedule (merely one component of material cost) is hardly probative of a conspiracy to fix the price for autobody repairs. It is well established that isolated requests for past market information from competitors, when undertaken without any agreement or understanding regarding reciprocity, does not raise antitrust concerns, since it fosters, rather than hinders, competition. *U.S. v. Container Corp. of America*, 393 U.S. 333, 335, 89 S.Ct. 510, 511, 21 L.Ed.2d 526 (1969).

Lastly, plaintiffs have not shown that any individuals mentioned in the memorandum had any policy-making authority or that the amount Allstate, State Farm and Travelers would pay for refinishing materials was at all similar. Without a further showing, the mere passing of price information does not raise an inference of an impermissible conspiracy. *Kline v. Coldwell Banker*, 508 F.2d 226, 232 (9th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975).

### c. *Liberty Mutual Memorandum*

A further communication cited by plaintiffs as probative is a Liberty Mutual mem-

orandum revealing that Liberty Mutual received a communication from another insurance company concerning Motor's Crash Estimating Guides. This guide is designed to aid insurance companies and autobody shops in preparing estimates. The particular correspondence by Motor Crash which was communicated to Liberty Mutual by another insurer was simply soliciting insurance companies, as well as shops, to participate in a Field Evaluation Board which would aid in developing the guide by studying various operational times. Absolutely nothing in the Motor Crash communication or in the communication between the other insurer and Liberty Mutual any way suggest the possibility of price fixing.[10]

#### d. *Deposition Testimony*

Lastly, plaintiffs also submit deposition testimony of Edward M. Deardurff and William West, third party independent adjusters and former officers of the Automobile Adjusters Association. Both men testified that at general association meetings the issue of the hourly labor rate charged by autobody shops would arise. Mr. West recalls a thousand conversations between representatives of insurance companies where the subject of labor rates came up. He could not remember any details, such as the day, the companies, or the dollars involved.

A closer review of their deposition reveals that these conversations are without probative value. Indeed, Mr. West described in some detail a typical conversation:

The typical and most common conversation is: "How much is the damn labor rate today?"

"I just paid $35 an hour down here on a Mercedes."

"Well, you are lucky you got that. I paid 40 last week."

There has been no conversation about what I'm going to pay tomorrow or today. It's just been, "Oh, my God." It's a matter of conversation.

Certainly this kind of "idle shop talk" does not support an inference of the existence of a conspiracy. In *Krehl v. Baskin-Robbins Ice Cream, Co.*, 1979–2 Trade Cases ¶ 62,806 at 78,707 (C.D.Cal.1979), Judge Williams stated:

Plaintiffs have presented in support of their direct price-fixing claims an odd dozen isolated communications among defendants over a seven-year period, some of which involve individuals with no pricing responsibilities for their respective companies. Plaintiffs also present evidence of some conversations among defendants, which this court finds was unfocused idle "shop talk" without conspiratorial purpose.... Plaintiffs have failed to show that any communications had an effect on the wholesale prices of any defendant. I find no basis upon which to infer a conspiracy from any communication or from price movements.

1979–2 Trade Cases ¶ 62,806 at 78,707.

The next evidence of "communication between defendants" which plaintiffs argue establishes a conspiracy is a statement allegedly made by Mr. Deardurff to plaintiff Frank Phillips that Mr. Deardurff and six to nine adjusters employed by defendants agreed that they would refuse to pay Mr. Phillips more than a certain labor rate.

This statement has several problems which, in the opinion of this court, detract significantly from any probative value it might otherwise possess. First, Mr. Phillips does not recall the names of the adjusters, the companies mentioned by Mr. Deardurff, the date of the conversation (this action spans only the years 1971–75), or the amount the adjusters agreed to pay. Secondly, Mr. Deardurff, who is an independent adjuster and not a party to this action, testified during his deposition that he could not recall making such a statement and that, quite to the contrary of Phillips' assertion, he always paid Mr. Phillips' rate. Lastly, Mr. Phillips' statement is hearsay which does not appear to fall under any

---

**10.** Liberty Mutual is no longer a defendant in this action as it has reached a settlement agreement with plaintiffs. We included this evidence anyway to examine the extent to which it might have implicated other defendants in some price-fixing scheme.

exception to the hearsay rule. Mr. Deardurff is not charged as a co-conspirator, nor has he been shown to be authorized to speak for any defendants. Hearsay evidence is not competent evidence under F.R. Civ.P. Rule 56(e) as evidence which can create triable issues of fact. However, even if we overlooked the hearsay nature of the statement, absent Phillips' remembering what companies were involved, we think this evidence is hardly probative that the insurance companies named as defendants in this action conspired to fix prices.

Finally, plaintiffs rely on their own declarations in which they state their belief that defendants have combined and conspired to fix prices and boycott their shops. However, during their depositions, each plaintiff testified that they had no information on which to base such a belief. Thus, this conclusory allegation simply cannot create a triable issue of fact, even under the more liberal antitrust summary judgment standard. Plaintiffs cite *Ingram v. Phillips Petroleum Co.*, 252 F.Supp. 674 (D.N.M.1966), for the proposition that summary judgment should be denied on the basis of plaintiffs' declarations alone. In *Ingram*, the court stated:

> We must conclude from a study of the evidentiary material presented that the evidence in support of conspiracy is less than strong. The statements in the deposition of D. L. Ingram to the effect that he suspected concerted action because price reductions occurred about the same time is the sum total of plaintiff's showing.... In light of the liberality allowed in the proof of a claim of conspiracy under the antitrust laws, in view of the fact that such proof is invariably difficult to uncover by a private litigant, the award of summary judgment on the conspiracy count in this case must be denied.

252 F.Supp. at 678–79. While that quote might support plaintiffs in another factual setting, it provides no authority here. Apparently, in the *Ingram* case, there was a virtually simultaneous reduction in the price of gasoline sold by the various defendants to the action. Here, plaintiffs cannot show any such price movement. By plaintiffs' own admission, the rates defendants were willing to pay varied by as much as 20 percent and were in a constant state of flux. Moreover, the rates defendants were willing to pay increased during the period of this action. Although that factor is not determinative of whether defendants engaged in price-fixing, it does add to the conclusion that, unlike the *Ingram* case, the price movement is *not* suspicious. Plaintiffs' declarations here, therefore, lack the underlying factual support which lend credibility to the otherwise simply conclusory allegations.

e. *Summary of Communication Evidence*

■ Plaintiffs urge this court, in our assessment of the evidentiary support of their allegations of conspiracy, to be guided by the principle that "a conspiracy [is] not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *United States v. Patten*, 226 U.S. 525, 544, 33 S.Ct. 141, 145, 57 L.Ed. 333 (1913). While such advice is well-taken, this court cannot add together independent pieces of evidence, each without probative value and find, as a total, an inference of a conspiracy. Such a proposition is legally and logically unsound. We therefore conclude that plaintiffs' evidence of communications between the defendants is not sufficient to raise a triable issue of fact regarding the existence of a conspiracy to fix the price of autobody repairs.

2. *Parallel Business Conduct*

■ Plaintiffs' next category of evidence which, in their opinion, supports the inference of a conspiracy, contains evidence of parallel conduct by some or all of the defendants. It is axiomatic at this point in the development of antitrust jurisprudence that mere parallel conduct alone does not create an inference of an impermissible conspiracy. *Independent Iron Works, Inc. v. United States Steel Corp., supra.* As we will discuss, plaintiffs fail to make the requisite showing that such conduct is present under circumstances suggesting joint agree-

ment, as distinguished from independent action.

■ Before we analyze further the nature of the parallel conduct, we note that plaintiffs admit that the hourly labor rate each defendant was willing to pay during the years relevant to this lawsuit varied by as much as 20%. In fact, in plaintiffs' own exhibit setting forth the amount they contend each defendant would pay, at only one time were two defendants willing to pay the same hourly rate. At all other times, each defendant's rates varied. This dramatic lack of uniformity in the hourly rate detracts significantly from any theory that defendants' parallel activity raises an inference of conspiracy to fix prices.[11]

The first five types of parallel conduct pointed to by plaintiffs are: (1) that each defendant set a maximum hourly rate which it would pay to autobody shops; (2) that "at least two defendants" belong to each of seven associations; (3) that most of the defendants utilized drive-in claim centers; (4) that four defendants conducted surveys to determine the prevailing rate; (5) that some defendants utilized two-party checks. Plaintiffs make the following argument regarding the self-interest standard: defendants, by refusing to pay a higher hourly labor rate, force shoddy repairs onto their insureds; that the insureds would change to other insurance companies *but for* the fact that other insurance companies likewise refuse to pay a reasonable amount and therefore also force shoddy repairs onto their insureds. Plaintiffs, however, offer no evidence that defendants' captive shops perform shoddy work, much

less that such a performance is due to the rates defendants are willing to pay.[12]

In *Quality Auto Body, supra,* the court rejected plaintiff's contention that the use of a common labor rate was sufficient to withstand a motion for summary judgment:

> That the labor rate used by the two companies may at times have been the same does not, without more, indicate that a conspiracy to fix prices exists. [citations omitted] Absent some evidence of agreement, the explanation for this similarity offered by the defendants—that they both merely made the same assessment of the prevailing market rate—is compelling.

1980–2 Trade Cases ¶ 63,507 at 76,796.

In essence it appears to this court that the parallel business practices against which plaintiffs here inveigh have as their obvious objective the reduction of costs which the defendant insurance companies incur in fulfilling their contractual obligations to their insureds. Such conduct is in the economic self-interest of each individual insurance company and would redound to their benefit regardless of whether other companies chose to act similarly. *See, e. g., Proctor v. State Farm,* 561 F.2d 262, 267 (D.C.1977), vacated and remanded on other grounds, 440 U.S. 942, 99 S.Ct. 1417, 59 L.Ed.2d 631 (1979). As many defendants point out in their briefs, to the extent that such cost savings are passed on to policyholders in the form of premium reductions, an insurer would stand to reap greater competitive advantage by concealing its cost saving programs than by sharing them.

11. Plaintiffs argued at oral argument that defendants have also agreed to fix the overall price of autobody repairs. Some defendants, plaintiffs charge, will pay a higher hourly rate and allow for fewer hours to perform the repair; other defendants, plaintiffs say, accord greater time but pay a lesser hourly rate. Plaintiffs, however, at no time, introduced any evidence that the overall price was at all the same. Indeed, they introduced no evidence at all regarding the overall price for repairs. They relied simply on the fact that, at all times, the price each defendant would pay was less than the plaintiffs would charge. This does not

state an antitrust violation; the antitrust laws protect competition, not competitors. *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

12. Plaintiffs point to the declaration of plaintiff Frank Phillips who states that he was a "captive" shop and that, during that time, his repair work was less than competent. Whatever this might say about Mr. Phillips, it hardly establishes that during 1971–1975, any of the defendants' "captive" shops did shoddy repair work because of the low rates the insurance companies were willing to pay.

Lastly, plaintiffs argue that the use of vertical provider agreements by each defendant is itself sufficient to raise an inference of a horizontal conspiracy to fix prices. The case cited by plaintiffs, *U.S. v. Paramount Pictures*, 66 F.Supp. 323 (S.D.N.Y. 1946), modified, 70 F.Supp. 53 (S.D.N.Y. 1947), aff'd in part and rev'd in part, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), on remand, 85 F.Supp. 881 (S.D.N.Y.1949), aff'd *per curiam*, 339 U.S. 974, 70 S.Ct. 1032, 94 L.Ed. 1380 (1950), arose on facts so radically different from those here that it provides no authority for plaintiffs' argument.

In *Paramount*, not only was there evidence of numerous *express* vertical agreements *among the defendants* fixing *minimum* prices to be charged *third parties*, four significant factors not present here, there was also evidence of numerous *express horizontal agreements regarding price*. Indeed, the defendants in Paramount were implicated by a tangled web of agreements. Moreover, the court in *Paramount* found that the plan to set a minimum price schedule would only have been in the interest of the defendants if all parties joined in. "The whole system presupposed the fixing of prices by all parties concerned." As we have seen, such a finding is not reasonable in the present case.

Plaintiffs also argue that the Court inferred a horizontal conspiracy to discriminate against smaller theatres from defendants' vertical arrangement with the larger theatre chains. This is simply inaccurate. Both the district court and the Supreme Court refused to decide whether defendants had conspired among themselves to discriminate against the smaller theatre owners since "each discriminatory contract constituted a conspiracy between licensor and licensee." 334 U.S. at 160, 68 S.Ct. at 930. Thus, the argument that this court should infer a horizontal conspiracy merely due to the existence of the informal arrangements with the preferred shops must fail.

In conclusion, this court is unable to find that the parallel conduct asserted here raises a triable issue of fact concerning a horizontal conspiracy. As counsel for defendants pointed out at oral argument, plaintiffs' argument that the parallel conduct establishes a horizontal conspiracy is, in the end, circular. Plaintiffs' argument proceeds through four steps: (1) Each insurance company engages in these various practices which are harmful to plaintiffs; (2) There would be no antitrust violations if such actions were independently taken; (3) But if such activity is undertaken pursuant to an agreement, it is unlawful; (4) As evidence of the agreement, defendants each engage in various similar practices. This process leads us naturally back to step 1 and through the remaining steps without revealing along the way any evidence from which a jury could conclude that these insurance companies have conspired to fix the price of autobody repairs in the San Francisco area.

### III. *Boycotts*

Plaintiffs argue that defendants have engaged in two different conspiracies to boycott plaintiffs' businesses. These are: (1) a horizontal conspiracy among insurance companies to boycott; and (2) a conspiracy between the insurance companies and their insureds. The McCarran-Ferguson Act, by its own terms, does not exempt activities of insurance companies which constitute coercion, intimidation or boycott. In *St. Paul Fire & Marine Insurance Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), the court held that the boycott exception was not limited to concerted activity against insurance companies or agents, or more generally, against competitors of members of the boycotting group. Thus, the court found the concerted action of four medical malpractice insurance companies against several policyholders to be subject to the antitrust laws. Although the court did not expressly hold that concerted activities of insurance companies directed against the provider of services falls within § 3(b) of McCarran-Ferguson, we believe that such a holding would be most consistent with the reasoning in *St. Paul*. We therefore proceed to examine plaintiffs' claims of illegal boycott.

### A. Conspiracy Among Insurance Companies to Boycott Plaintiffs' Businesses

■ Plaintiffs argue that "defendants' concerted efforts" in directing policyholder to "preferred" or "captive" shops, rather than to plaintiffs' shops, establishes a *per se* violation of the Sherman Act. Plaintiffs rely on the same evidence (discussed above) that they used to establish a conspiracy to fix prices. In addition, plaintiffs cite the following acts as constituting boycott, coercion and intimidation: (1) efforts to dissuade vehicle owners from using plaintiffs' shops; (2) threatening to remove vehicles from Chavez shop by five defendants unless Chavez shop yielded to defendants' price demands; (3) informing vehicle owners not to allow plaintiffs to do repairs because their prices were too high; and (4) boycotting specific shops by three defendants.

Plaintiffs, however, fail to recognize, either through argument or documentary evidence, that the lynchpin of an actionable group boycott under the antitrust laws is *concerted* action. In *St. Paul*, the Court stated that "conduct by individual actors falling short of concerted activity is simply not a 'boycott' within § 3(b)." 438 U.S. at 555, 98 S.Ct. at 2937. Plaintiffs are unable to point to any shred of evidence which would suggest that defendants concertedly directed insureds away from plaintiffs' autobody shops. On the contrary, the evidence demonstrated that approximately ⅔ of plaintiffs' business during the four-year span relevant to this lawsuit was derived from defendants' insureds. While the fact that a boycott is not absolute would not be dispositive, the fact that a substantial proportion of plaintiffs' business came from defendants makes plaintiffs' lack of agreement evidence all the more significant. As the D.C. Circuit stated in *Proctor*:

> [T]he absence of a complete refusal to deal did make it all the more important, if appellant wished to survive summary judgment, for them to come forward with some additional evidence tending to prove

a tacit or express agreement among appellees.

561 F.2d at 267.

Without evidence tending to show some agreement among the defendants, we are left with the same evidence which we reviewed for plaintiffs' claim of a horizontal conspiracy to fix prices. As we have already stated, such parallel techniques were in the interest of each insurance company which adopted them, regardless of what the other defendants decided to do. Hence, we are unable to conclude that plaintiffs have demonstrated a triable issue of fact regarding the existence of a conspiracy to boycott the plaintiffs' repair shops. *In accord, see, Quality Auto Body, supra; Chick's Auto Body v. State Farm Mutual Automobile Ins. Co.*, 168 N.J.Super. 68, 401 A.2d 722 (1979).

### B. Conspiracy between Insurers and their Insureds

■ Plaintiffs' only legal support for this novel boycott theory (not raised in either *Quality Auto Body* or *Proctor*) is *General Glass Co. v. Globe Glass and Trim Co.*, 1980–2 Trade Cas. ¶ 63,351 at 76,842. In *General Glass*, Allstate had embarked upon a program to funnel glass repair work to a few large volume operations that could then reduce prices charged to Allstate. This program began with a survey directed at eliminating shops unable to cope with large volume. It resulted in the negotiations of express agreements between the few select high capacity shops whereby Allstate agreed to direct a high volume of business in exchange for a lower price. In addition, these shops were to bill Allstate on a monthly basis.

When an insured contacted Allstate, he would receive a card designating the addresses of glass shops serving a particular district claim office. If the insured balked at the use of one of the shops on the card, a supervisor would attempt to persuade the individual to use a recommended shop. There was also evidence that, in a few instances, individuals would be told they had no choice in the selection.

In response to plaintiffs' allegations that the foregoing conduct established a conspiracy between insurers and the insured to boycott glass repair shops not on the list, the court, recognizing that a conspiracy requires knowing acquiescence and participation, held that the facts were insufficient to resolve the matter before trial.

There are several factors which counsel against the wholesale adoption of the rationale of *General Glass* here. First, whatever evidence the court had before it in *General Glass*, plaintiffs have made *no* showing here that there was "a unity of purpose or common design or understanding or a meeting of the minds in an unlawful agreement," *American Tobacco Co. v. U.S.*, 328 U.S. 781 at 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575, between defendants and their insureds. In the absence of direct evidence to the contrary, the most that could be presumed is that insureds, in requesting names of body shops or in following suggestions given by insurance companies, are doing so in an effort to have his/her car repaired in a convenient location at a competitive price. It would be unreasonable for this court to infer that insureds, in doing either of the above, have any specific intent to use their buying power, together with that of the insurance company, to boycott these particular plaintiffs. Further, even if we assume an anti-competitive intent on the part of the insurance company, we could not presume that the insureds share in this intent absent any evidence supporting such a presumption.

Secondly, while a boycott is actionable even if not wholly successful, at some point the magnitude of business done by the alleged boycotters with the boycotted parties forces the conclusion that there was no boycott at all. Plaintiffs here admit that ⅔ of their business over the relevant time period was with the defendant insurance companies. Thus, to the extent that defendant insurer and their insured have generally continued to utilize plaintiffs' services, plaintiffs' claim of boycott is reduced to a claim that each time an individual insured chooses to do his business elsewhere at the behest, suggestion or approval of his

insurance company, the individual and the insurance company are boycotting plaintiffs' business. This is patently absurd.

Finally, we question the applicability of the boycott prohibition to the facts at hand. In *Royal Drug*, in a similar context, the Supreme Court characterized the insurance company as the purchaser of services. As such, the insurance company acts as the agent of the insured in purchasing the services contracted for by the insured. Given this characterization, the insurer and the insured act singularly when they choose not to do business somewhere; by definition, they do not act in concert. The fears attendant upon a concerted refusal to deal are simply not present when the insurance company and insured decide which provider will perform the necessary services.

For the foregoing reasons, we find that plaintiffs' theory that the defendants and their insureds have conspired to boycott plaintiffs' businesses must fail.

### IV. *Conspiracy with Captive Autobody Shops to Fix the Price of Autobody Repairs*

Lastly, plaintiffs argue that defendants have conspired with their preferred shops to fix the price of autobody repairs. Although plaintiffs do not claim that the provider agreements, by themselves, violate any antitrust provision, plaintiffs argue that these agreements evidence a conspiracy between defendants and captive shops. In support of this unusual theory, plaintiffs again cite *General Glass Co.*, *supra*. Along with several other contentions, plaintiffs there claimed that Allstate had conspired with the few select high capacity shops to fix the price for glass repair work. The court denied defendants' motion for summary judgment, stating:

Similarly, although conscious parallel conduct without more is not violative of the Sherman Act, [citation omitted] when such conduct follows upon an agreement to participate in concerted action, it becomes illegal. Thus, the crucial factual question becomes, what did the glass

shops know and when did they know it? I conclude that under the standards governing motions for summary judgment discussed earlier, this question cannot be answered on the basis of the submissions presented to me by the parties.... I am still left without enough facts to determine whether or not the defendant and the alleged co-conspirator glass shops became aware that they were participating in a program involving only a limited number of shops who were parties to an agreement or understanding between them to adhere to uniform prices in consideration of a diversion to themselves the bulk of the Allstate connected business.

1980–2 Trade Cases ¶ 63,531 at 76,852.

We first note that, factually, this case is quite different from *General Glass.* Significantly, there is no evidence here of an actual program by an insurance company to do business only with three or four shops who have entered into formal, written agreements with an insurance company. Instead, the evidence submitted to this court clearly revealed that the insureds were free to do business with any autobody shop as long as they were willing to pay the difference between the shop price and the insurance companies' estimate. Such a factual framework does not lay an adequate foundation for a theory that captive autobody shops conspired with the insurance companies to fix the price of autobody repairs in San Francisco.

Moreover, plaintiffs have introduced *no* evidence tending to show that the provider agreements were anything other than contracts for the purchase of services. There is no evidence that the purpose or effect of these agreements was to alter the price structure of the San Francisco area, *Sitkin Smelting & Refining Co. v. F.M.C.,* 575 F.2d 440 (3rd Cir. 1980) nor is there any evidence whatsoever of other agreements, tacit or express, between the preferred shops and the insurance companies concerning the price of repairs in San Francisco. Furthermore, there is no evidence that the autobody shops have agreed among themselves to charge a certain rate for their services. Absent all such evidence, we are left only with the provider agreements themselves, which plaintiffs do not argue are illegal.

Although plaintiffs are less than clear about the essence of this contention, they may be arguing that the provider agreements evidence parallel conduct on the part of the autobody shops which supports the inference of a conspiracy. Such a claim would lack merit, however, since there is no showing that it would be against the self-interest of the repair shop acting independently to enter into such an agreement.

Plaintiffs cannot simply advance a theory upon which relief could be forthcoming and hope to withstand a motion for summary judgment. Absent any evidence from which a trier of fact might conclude that a conspiracy exists between the insurance companies and their alleged "captive" shops, plaintiffs' claim must fall.

## CONCLUSION

This court is not unmindful of the strong policy against granting summary judgment in favor of the defendant in antitrust cases "where motive and intent play leading roles." *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). However, we do not believe that disposition of an action through the vehicle of summary judgment is to be read out of antitrust cases entirely. As the Supreme Court stated in *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968):

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action to be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

391 U.S. at 290, 88 S.Ct. at 1593. In the present case, the defendants, through numerous affidavits and declarations, have

successfully rebutted the allegations of conspiracy. It is therefore plaintiffs' burden to come forward with specific factual support of its allegations. *ALW, Inc. v. United Airlines, Inc.*, 510 F.2d 52, 55 (9th Cir. 1975). This they have not done. We therefore conclude that summary judgment for the defendants is proper.

On the basis of the foregoing memorandum, we hereby order that defendants' motions for summary judgment be granted.

SO ORDERED.